No. 2-08-0838          Filed: 10-21-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 06--CF--2062 |
| ERNESTO VALLE, | ) ) ) | Honorable Grant S. Wegner, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BOWMAN delivered the opinion of the court:

Defendant, Ernesto Valle, appeals from his conviction of first-degree murder (720 ILCS 5/9--1(a)(1) (West 2006)) with a sentencing enhancement based on defendant's having personally discharged the firearm that killed the victim (730 ILCS 5/5--8--1(a)(1)(d)(iii) (West 2006)). He contends that, because certain inculpatory statements he made during police interrogation were involuntary, the court erred in admitting them, making the ensuing trial unfair. At issue here is the proper standard of review when this court has a full video record of the interrogation sessions that produced the inculpatory statements. Defendant argues that, because the video record places us in the same position as the trial court, our review is de novo. We disagree, concluding that review is under the usual bifurcated standard for voluntariness decisions. Under that standard, we find no error in the court's decision to admit the statements. We therefore affirm defendant's conviction.

Defendant also asserts that the court lacked authority to impose a $100 trauma center fee; the State confesses error. We accept the confession of error and modify defendant's sentence accordingly.

## I. BACKGROUND

A grand jury indicted defendant on two counts of first-degree murder based on two theories of his culpability for the August 12, 2006, shooting death of Jessie Lozano. Defendant moved to suppress inculpatory statements that he made to police interrogators, arguing that, because the police deprived him of sufficient food, water, and sleep, the statements were involuntary. He also asserted that his intellectual limitations made him particularly susceptible to police coercion and deception.

At the suppression hearing, Detective Jeff Parrish of the Aurora police testified that he was the lead investigator on the Lozano case. He started questioning defendant at around 2:55 a.m. on August 13, 2006. This interview lasted about two hours, but with breaks and changes of personnel. A second interview took place starting at approximately 10:20 p.m. the same day. Between the two interviews, the police held defendant in the booking area, in a cell with a bunk.

The State offered digital video discs (DVDs) of the interrogation, and the court admitted them without objection from defendant. Parrish admitted that police records suggested that defendant had never previously been arrested for any criminal offenses. He agreed that the DVDs showed the presence of Special Agent Larissa Camacho of the FBI. Camacho displayed to defendant a DVD that she claimed contained a recording of an "overhear" in which defendant, at a party, bragged of his committing the Lozano shooting. She also claimed that the victim was an FBI informant. Parrish agreed that both of these claims of Camacho's were false.

The parties stipulated that Officer John Munn of the Aurora police had interviewed Hector Delgado, defendant's friend, and that Delgado, before the interrogation of defendant, had implicated

defendant. The State then asked the court to watch the four DVDs on which the police recorded the interrogation. We now describe the contents of those DVDs.

The first disc is captioned "8/13/2006 1:34 AM." As it opens, defendant is seated in an armless metal and plastic chair. A bare desk with a desk chair is to his left. There is a window with closed blinds over the desk. He soon appears to be dozing. About 24 minutes after the start of the recording, Aurora police detectives come in and introduce themselves as "Jeff" and "Darryl." One brings out a rights waiver form and asks him about his English and reading comprehension. They go through the form, and defendant reads the first line aloud awkwardly. He reads the entire form silently and immediately signs. The detectives mostly address defendant as "dude." Defendant addresses each detective as "sir" throughout.

Asked to describe what he did the previous night, defendant says he started at a family party at his house, went to another large party on Coolidge at about 11:30, got sick and "wasted," and went home with his friends Hector and Chris at about 1:10 a.m.

The detectives tell him that people from the Coolidge party, including Chris and Hector, have connected him with a shooting, that others have picked him out of a photo lineup, and that this is his chance to tell the truth. Defendant gives more details of the evening, denying knowledge of the shooting and asking to take a lie detector test. That portion of the interview lasts for about 15 minutes.

The officers leave defendant sitting for about six minutes, saying that they are going to get a photograph of the victim. The officers then take defendant to a restroom.

After a minute, all return, and the officers start to press defendant to explain an inconsistency in his description of the evening. Defendant emphasizes that he was extremely intoxicated. The officers tell him that they already know what happened, suggest that there might have been a "legitimate reason" for the shooting, but tell him that he will not have another chance to credibly

explain that reason. Defendant continues to deny his involvement. He asks for a cigarette, and they leave, saying that they will bring him one. This portion of the interview lasts for 12 minutes and the break that follows lasts for 5 minutes.

The detectives return with an ashtray and cigarettes. They start questioning defendant about his association with the Latin Kings. Defendant says he hangs around with "Spooky Lou." They tell him that he "got [his] crown" last night, that he got "the blessing." He denies it. They ask him how he can be so disrespectful of the Kings when he had just been made a member.

The officers' tone shifts toward the intense, with frequent use of phrases like "no fucking around." They tell defendant that Hector has implicated him. Defendant starts to become upset. He swears that he was not involved. Things continue to intensify, with one detective moving his chair closer and closer to defendant's. Defendant continues his denials. The detectives reduce the intensity of the questioning and begin to suggest to defendant that the shooting might have been self-defense or otherwise excusable. One detective suggests that someone put him up to it. The other tells him that if the shooting were done in the heat of the moment or in self-defense, it would not be premeditated. They tell him that they are going to give him a while to consider his position, and they leave. He asks for water, but does not get it. This portion of the interview lasts for 10 minutes.

After a break of about seven minutes, two new detectives, "Bill" and "John," come in. They tell defendant that they are the ones who have been interviewing Hector. The tone is calm again. Defendant describes the evening again, and they tell him that Hector's story is very different. They say that "Hector spilled it" and that he is "putting shit" on defendant. They also say that others at the party also say his story is wrong. They tell him that they already know that he got his crown.

One detective takes a sympathetic tone. He pushes the idea that the shooting was "an accident" and that defendant was a victim himself because the Kings pressured him into it. He suggests that the Kings might have hurt him if he did not do as they said, and that the shooting therefore was self-defense. Then he suggests that defendant did not intend to kill the victim and says that an accident is very different from premeditated murder.

This detective now tells defendant that Hector completely betrayed him and that Chris has made a deal. The other detective takes a harsher tone. He tells defendant that, if he denies getting "blessed," the Kings will "violate" him. The other detective stands up, moves close to defendant, and starts shouting at him. He continues to suggest that the shooting was an "accident." He says that the difference between an accident and a premeditated murder is what defendant can use to avoid a life sentence. Next, he turns to arguing that the Kings' hierarchy is treating defendant as "their little bitch."

Defendant begins to repeatedly ask the detectives what they want him to say. One detective asks for "something to work with." This detective shouts at defendant repeatedly, telling him that he is the victim, but not to "waste [his] breath" denying that he did it. One detective asks the other if it "was a chrome 0.45 or black" and the other says "black." Defendant tells the detectives that he is cold; he also asks for water. The detectives leave. This portion of the interview lasts approximately 28 minutes. After five minutes, they bring him a blanket and water. Defendant pulls the blanket around him.

The next disc starts at, by its caption, about 3:45 a.m. Defendant has the blanket around him and his head down. He appears to be sleeping. The original detectives return six minutes after the recording starts. They tell him that the other detectives think that he deserves another chance to

explain himself, but that they are skeptical. They tell him that an explanation now will "carry a lot of weight." Defendant continues to deny his involvement, and the detectives leave, displaying frustration with him. This portion lasts for seven minutes.

The next disc starts, according to the caption, at 9:17 p.m. The recording opens with two officers escorting defendant into a room much like the first, but windowless. They state that the time is 10:17 p.m. They leave him sitting in an armless chair. He pulls his arms inside his T-shirt and crosses them. After about six minutes, two men and a woman enter. They introduce themselves as Jeff Parrish ("Jeff" from the first night) and "Rob Wallace," both of the Aurora police, and Special Agent Camacho of the FBI. Camacho tells defendant that it is a crime to lie to her. She displays a compact disc (CD) or a DVD in a plastic case and tells defendant that someone at the party was wearing a wire that picked up defendant bragging about the shooting. She also says that the victim was her informant, making the matter potentially a federal offense.

Camacho suggests to defendant that the matter can be kept at the state level, but tells him that, in a federal prosecution, he will get "85% time." She says that she knows that defendant "shook up" with "Ric Dog" and that he "got the blessing." She suggests that if he can convince the Aurora officers that he did not know that he was killing an FBI informant, the FBI will be willing to leave it as a state matter. Like the Aurora detective, she also suggests that the shooting was an "accident."

Defendant describes his actions with little change from his previous tellings except he says that at "Chonnie's" he was telling a "bullshit lie" about what he had done and did not think that anyone had really been shot. Camacho tells him that his choices are either they will play the tape in court, she and her informants will testify, and he will be "fucked," or he can tell the truth. Defendant asks whether, if he says what they want him to, they will go easy on him. They say that maybe there is a "legitimate

reason" the shooting happened. Defendant offers to take a lie detector test. He is crying, or nearly so. Camacho says that Ric Dog did not "shake up" with him for no reason and starts reciting who was at the party. Defendant becomes angry and suggests that, if they bring in Chris and Hector, everything will be cleared up.

They say again that defendant was seen "shaking it up" with Ric Dog, the Latin Kings' enforcer. Defendant admits shaking up. They tell him that they found gunshot residue in the car. One detective tells him to "get it off his chest." He says that the best thing defendant can say is " 'I screwed up.' " Defendant says, "I screwed up."

Defendant says that "it was a mistake" and that he "thought it was someone else." They ask him where the shooting happened. He says that he does not know, that it was somewhere on the east side. They ask him if it could have been near Liberty and the Oak Park School. He agrees that it could have been. He says he met with Hector and Chris at a party at his house, went from there to the party with the Kings, and stayed there awhile. He then left, sitting in the front seat of Hector's car with Hector driving and Chris in back. In the back of the car was a 9-millimeter Glock semiautomatic with a chrome finish, a "nation's" (gang-owned) gun.

Defendant saw a "guy" in a vehicle going the opposite direction and started "mad dogging"[1] him. He got out of the car and Hector drove around the block. He shot three times at the vehicle. He did not know at whom he was shooting. The victim was the first person he saw, and he could not see the vehicle. He ran back to Hector's car without seeing what happened to the vehicle or the driver.

---

[1]Apparently, staring at a person threateningly.

Defendant tells the three that they did not go back to the party after that, but Camacho tells him that of course he did. He agrees with her. He says that, back at the party, he "shook up" with Ric Dog. He agrees that Ric Dog was the Kings' enforcer and had given him his crown on the spot. One detective says that defendant must have given Ric Dog a "play by play," but defendant says that he had just said that he had "hit him up."

Questioned about how sure he is about the appearance of the weapon, defendant becomes less certain, saying that he thought that the detectives had told him that the weapon was a 9-millimeter Glock. They ask him if he has ever committed any other murders. He says that he has not. This portion of the interview lasts for 33 minutes.

The caption now says that it is 10:18 p.m. Eleven minutes after the recording begins, detectives enter and ask defendant to identify photographs. Asked to go over the details again, he says that he does not remember the locale of the shooting or where in the street he was standing when he shot. He says that he, Chris, and Hector left the party at his house at about 9:30 or 10 p.m. They went to "Spooky Lou and Chonnie's" house and stayed there for about an hour. They left with Hector driving and cruised around for less than an hour. Hector told him that there was a gun, a semiautomatic, behind the seat. Defendant is now not sure whether the gun was black or chrome. He now tells the detectives that the shooting took place before they ever went to the party on Coolidge.

Describing the shooting again, he says that Hector pulled over, let him out, and told him that the car would be around the corner. A car came toward him, and he shot three times at it as it was coming up to him; he shot from "far away." He could not say anything about the vehicle. He ran to Hector's car, which was waiting for him around the corner, and got in. He said, "let's go to the spot."

Only then did they go to the party. The first person he saw was Ric Dog. He said to Ric Dog that he "hit someone up," and Ric Dog "welcomed [him] home." He, Hector, and Chris all "shook up" with Ric Dog. They stayed for less than 30 minutes. They left, he was driven to his home, and the others went to White Castle. He passed the gun to Hector in the car. Defendant tells the detectives that the victim was just a person passing down the street. He was not sure exactly what it meant to have "come home."

The detectives ask defendant how they had treated him. He says that he could not eat in booking, but agrees that they had offered him food. After a short break, the detectives ask defendant if he can verify the conversation that Camacho recorded. He says he cannot remember any details. He asks if he can lie down, and they say that they can bring him a blanket to lie on the floor. The officers leave 38 minutes after the recording begins, and 56 minutes after it begins, they return to take him to booking. They are sympathetic, offer him food, and say they will arrange to let him talk to his family. They leave, and nothing more happens until the recording ends.

After watching the recording, the court continued the hearing for several days. Resuming the hearing, it ruled that the State shifted the burden of showing involuntariness to defendant.

Defendant then testified that he had been 18 years old on August 13, 2006. He had graduated from East Aurora High School, but had been in special education all four years because he "had trouble understanding." He had never before been arrested or interrogated. The police had taken him into custody at around 1 a.m. When arrested, he had been in bed for a few minutes and was not asleep. He had slept until noon on August 12. When the police took him into custody, he had recently been at a party and had drunk four or five beers. He did not know when he had last eaten.

While he was in the detention cell, he did not eat because he was not hungry. He was tired, but could not sleep.

After another recess of several days, the court ruled that the inculpatory statements were admissible. It stated its factual conclusions. It found that the officers did not falsely suggest sympathy. It recognized that the tone of the interviews sometimes became accusatorial and that the officers "slid their chairs into defendant's space" and shook a finger at defendant. It noted that Camacho had engaged in deception. The court accepted the validity of the Miranda warnings. It found that defendant had been articulate and responsive in his answers throughout the interrogation.

Defendant had a jury trial. The State's primary evidence, apart from the confession, came from the testimony of Chris (whom the State did not charge) and Hector (who had pleaded guilty to conspiracy to murder, under an agreement to testify against defendant). Both testified that the three went from a party at defendant's house to another at a Kings' hangout on Coolidge. Both described defendant talking to Ric Dog and getting passed a gun. Hector described defendant as saying that he wanted to get his crown.

Chris testified that he started to feel sick and went out to the car to sleep. The next thing he was aware of was the sound of gunshots and then defendant running toward the car with a gun in his hand. Explaining that "nigga" did not usually mean a black person, he quoted defendant as saying, " 'I got the nigga,' something like that." The three returned to the party and defendant started bragging that he got his crown. Chris, Hector, and defendant "shook up" with Ric Dog.

The parties stipulated that Chris, when interviewed, initially denied his involvement then later said that the shooting took place on the way to Coolidge from defendant's house.

Hector testified that defendant asked him to drive to another party to look for women. They drove off, with defendant giving directions. Hector got to a place where he thought a party was going on because he saw cars going in and out of the driveway; he did not know where it was. Defendant asked if Hector had seen "that truck" or "that SUV." Hector saw a big pickup truck. He started looking for a place to park. Defendant said, "pull over."

Defendant and Hector talked for a bit. Hector saw the truck coming head-on toward them, and defendant asked if it was the truck they had seen. Defendant got out of the car, gun out, and started to run toward the truck. He got to the intersection and started shooting. Hector heard "three to five shots" or "[f]our to five shots," fired rapidly. Chris woke up in the backseat. Defendant ran back to the car. The truck started rolling backward. Defendant got back in the car and said that "he got him." Hector drove away fast and returned them to Coolidge. On the way, defendant told Hector that the person had been "snitching." They got back, and defendant told Ric Dog that he got him. They "shook up," and Ric Dog told them that they were "shorties" (associate members) and had "come home." Hector said that defendant would have gotten his crown based on the shooting. Defendant gave the gun back to the person who had it originally. After about half an hour, defendant left the party with Hector and went to defendant's house.

An officer involved in defendant's arrest testified that, when defendant came out of his house after the police ordered all occupants out, defendant told the police that the other person was his brother and had "nothing to do with this."

Defendant presented alibi witnesses who said that he was already home by the time of the shooting. These were his brother and someone who was a friend, albeit not a close one. The second person admitted to having been highly intoxicated.

Enrique Torres (Ric Dog) also testified for defendant, contradicting Chris's and Hector's description of the Coolidge party by describing the party as getting very quiet after police stopped by. Aurora police officers testifying for the defense confirmed that they had visited the address.

The jury found defendant guilty of the murder and of having discharged the firearm. Defendant filed a posttrial motion, challenging, among other things, the admission of the inculpatory statements. The court denied the motion and sentenced defendant to 45 years' imprisonment, a sentence that included a 25-year enhancement based on defendant's discharge of the firearm. The sentence also included a $100 trauma center fee. Defendant timely appealed, challenging the propriety of the statements' admission and the lawfulness of the trauma center fee.

Defendant now argues that, because the trial court based its decision predominately on the interrogation videos that are part of the appellate record, the trial court had no advantage over us in deciding the voluntariness of his statements. Thus, he asserts, de novo review is proper. He further asserts that, taking into account that he had particularly low resistance to aggressive or deceptive interrogation techniques and the aggressive and deceptive techniques that the police used, we can conclude that the police overbore his will, making his inculpatory statements involuntary. Finally, he argues that no statutory authority exists for imposing the trauma center fee after a murder conviction. The State confesses error as to the fee.

## II. ANALYSIS

We start by describing the general standards for a voluntariness decision. We then follow with our discussion of the relevant standard of review. We conclude that we cannot take on the trial court's role of finder of fact, so that, despite the record's containing the interrogation videos, our review uses the usual bifurcated standard. On that standard, we find no error in the court's

determination that the statements were voluntary. Finally, we accept the State's confession of error concerning the fee.

> "In determining whether a statement is voluntary, a court must consider the totality of the circumstances of the particular case; no single factor is dispositive. Factors to consider include the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the presence of Miranda warnings; the duration of the questioning; and any physical or mental abuse by police, including the existence of threats or promises. [Citations.]
>
>        \*\*\*
>
> Where a defendant challenges the admissibility of an inculpatory statement through a motion to suppress, the State bears the burden of proving, by a preponderance of the evidence, that the statement was voluntary. [Citations.] The State carries the initial burden of making a prima facie case that the statement was voluntary. Once the State makes its prima facie case, the burden shifts to the defense to produce some evidence that the confession was involuntary [citation], and the burden reverts to the State only upon such production by the defense." People v. Richardson, 234 Ill. 2d 233, 253-54 (2009).

Under Illinois law "a confession may be deemed involuntary in the absence of police misconduct, based entirely on the defendant's personal characteristics." People v. Westmorland, 372 Ill. App. 3d 868, 876 (2007).

In reviewing a ruling on the suppression of inculpatory statements, we may consider all the evidence adduced at trial as well as that adduced at the suppression hearing. People v. Slater, 228 Ill. 2d 137, 149 (2008); People v. Caballero, 102 Ill. 2d 23, 34-36 (1984).

Defendant argues that, because we have the videos of the interrogation, we are equally situated with the trial court for deciding the voluntariness of defendant's confession and our review therefore should be de novo. In support of his argument, defendant has cited People v. Rubio, 392 Ill. App. 3d 914 (2009), a published opinion of this court that the supreme court vacated without opinion (People v. Rubio, 234 Ill. 2d 544 (2009)) shortly after defendant filed his initial brief. Because our holding in Rubio relied entirely on the supreme court's holding in Addison Insurance Co. v. Fay, 232 Ill. 2d 446 (2009), we can give meaning to defendant's argument by treating his citations of our holding in Rubio as being to Addison Insurance. We conclude that the rule in Addison Insurance is inapplicable when, as here, the trial court has heard live testimony relating to a disputed issue of fact. Similarly, cases such as People v. Oaks, 169 Ill. 2d 409 (1996) (which endorses de novo review when videos in the appellate record resolve all issues of fact), are inapplicable in a case such as this one, where videos in the record do not resolve all issues of fact.

The usual standard of review for a voluntariness decision is a bifurcated one in which the reviewing court is deferential to the trial court's findings of fact, but not to its ultimate determination of voluntariness. In 2000, in In re G.O., 191 Ill. 2d 37, 46-50 (2000), the supreme court explicitly adopted such a bifurcated standard of review, a standard that it based on the bifurcated standard in Ornelas v. United States, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996).

The G.O. court noted that Illinois courts had, until then, always used a manifest-weight standard overall in reviewing a decision on the voluntariness of a confession. G.O., 191 Ill. 2d at 46-47. It cited Oaks, 169 Ill. 2d at 447, which is a pre-Ornelas decision, as an example of that standard's general recognition. G.O., 191 Ill. 2d at 46-47. However, it noted that, in Oaks, it had "reviewed the ruling de novo because the record contained both a videotape and a transcript of the

interrogation." G.O., 191 Ill. 2d at 47. The G.O. court went on to explain that the bifurcated standard was preferable to the manifest-weight standard because it promoted uniformity of precedent. It concluded:

"Consequently, in reviewing whether [the suspect's] confession was voluntary, we will accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence. However, we will review de novo the ultimate question of whether the confession was voluntary." G.O., 191 Ill. 2d at 50.

The G.O. court did not suggest that the Oaks court, under the facts of that case, had erred in using a de novo standard overall.

In Addison Insurance, the supreme court set up a challenge to the fundamental idea that a reviewing court should always be deferential to a trial court's findings of fact. It held that de novo review was proper where the trial court had acted as a fact finder but the parties had presented all the evidence as documents or transcripts:

"Both parties acknowledged at oral argument that all testimony was submitted by admitting discovery depositions into evidence. The trial court was not required to gauge the demeanor and credibility of witnesses. [Citation.] Instead, the trial court made factual findings based upon the exact record presented to both the appellate court and to this court. Without having heard live testimony, the trial court was in no superior position than any reviewing court to make findings, and so a more deferential standard of review is not warranted. Thus, although this court has not done so recently, we reiterate that where the evidence before a trial court consists of depositions, transcripts, or evidence otherwise documentary in nature, a reviewing

court is not bound by the trial court's findings and may review the record de novo." Addison Insurance, 232 Ill. 2d at 453.

At a less fundamental level several decisions imply that, where the interrogation is on a video recording, the facts are not in dispute and review is necessarily de novo. Oaks is the most important example of such a case:

"Although this court has never departed from the 'manifestly erroneous' standard in reviewing the denial of a defendant's motion to suppress based upon the voluntariness of a confession [citation], this is because, in a vast majority of cases, the voluntariness determination involves resolving conflicts in the facts and questions as to the credibility of witnesses which is best done by the trial court. [Citation.] However, here, the record contains both a videotape and a transcript of the interrogation, so that neither the facts nor the credibility of witnesses is in issue. Thus, the voluntariness of defendant's statements is a question of law which this court may consider de novo." Oaks, 169 Ill. 2d at 447-48.

Because the Oaks court held that the facts were not in dispute, the holding in G.O. does not affect this result.

The rules in Addison Insurance and Oaks are inapplicable here, as live testimony had a role in resolving a disputed issue of fact. Defendant suggests that suppression was warranted in light of his susceptibility to aggressive or deceptive interrogation techniques. His susceptibility is an issue of fact. Further, it is an issue on which the videos, though highly relevant, are not wholly dispositive. Indeed, we judge that it was primarily to address this issue that the defense had defendant testify about his status as a special education student in high school and his lack of food and sleep during

the interrogation. Because of the role of live testimony in the suppression decision, our review must be under the bifurcated standard of G.O.

Turning to the merits of the matter, we affirm the use of defendant's inculpatory statements. Defendant structures his argument for a de novo review, suggesting findings of fact that this court should make and arguing the weight that we should give our own findings of fact. He thus says nothing explicitly about any manifest error in the trial court's findings of fact or about the proper weighting of the facts that the court did find. Nevertheless, certain implications of his arguments are applicable to bifurcated review. First, defendant does not accept the trial court's tacit finding that he was not unusually susceptible to the police tactics. Second, defendant would have us give such weight to the use of deceptive and aggressive interrogation tactics as to make his confession involuntary.

We do not deem a finding that defendant lacked any special susceptibility to the police tactics to be against the manifest weight of the evidence. In oral argument, defense counsel summarized defendant's claims about his susceptibility by describing him as "a follower." The videos lend color to that characterization, but that does not mean that the trial court was wrong. Certainly, the videos suggest that defendant was obedient and perhaps even desirous of pleasing the police, but that does not place him notably far from the norm. Had the trial court described defendant as unusually tough and defiant of authority, it would have been wrong. However, it merely found nothing unusual to note, a finding that defendant's demeanor in court may have supported and that is consistent with the record before us.

Defendant is correct that police aggression and deception are factors that weigh in favor of finding involuntariness. He has not, however, pointed to any authority suggesting that the degree of

aggression and deception involved here results in an involuntary confession absent particular susceptibilities of the suspect's. Defendant cites People v. Bowman, 335 Ill. App. 3d 1142, 1153 (2002), a case that stands for the proposition that use of certain deceptive interrogation tactics results in statements that must be suppressed. The tactics in Bowman, however, are distinguishable from those here.

In Bowman, the defendant had confided to a jailhouse informant, Stark, that he had an intense fear of returning to Menard Correctional Center. Stark (encouraged by a sheriff's deputy who offered him leniency) told the defendant that, after he bonded out, he would help the defendant escape from the jail. The defendant and Stark concocted a scheme by which the defendant would avoid transfer back to Menard and thus stay in jail until Stark could help him. He would deliberately injure himself so that the authorities would not move him, and he would keep the local police interested in him by giving them information about his involvement in a murder. Bowman, 335 Ill. App. 3d at 1146.

Affirming the decision of the trial court, the Bowman court ruled that, "[b]ased on the totality of the circumstances, we conclude that defendant's confession was the result of deceptive interrogation tactics calculated to overcome defendant's free will at the time of his confession and that defendant's confession cannot be deemed to be the product of a rational intellect." Bowman, 335 Ill. App. 3d at 1154. The facts in Bowman are distinguishable from those here on several bases, the most important of which by far is that the escape scheme deliberately played on the defendant's intense fear of returning to Menard. That kind of manipulation is not at issue here.

Illinois decisions have found inculpatory statements made after deception similar to that here to be voluntary. Comparable cases in which Illinois courts accepted the voluntariness of statements

induced by deceptive interrogations include People v. Kashney, 111 Ill. 2d 454, 462 (1986), People v. Martin, 102 Ill. 2d 412, 417-18 (1984), and People v. Minniti, 373 Ill. App. 3d 55, 71 (2007).

Defendant would have to look to out-of-state cases to find decisions holding statements made under comparable circumstances to be involuntary. In Commonwealth v. DiGiambattista, 442 Mass. 423, 424, 813 N.E.2d 516, 518 (2004), the defendant gave an inculpatory (and inconsistent) statement after an interrogation that featured false evidence of his guilt and police downplaying of the seriousness of the offense. DiGiambattista, 442 Mass. at 424-30, 813 N.E.2d at 518-22. The Massachusetts Supreme Court held that the confession was involuntary. Examining psychological studies concerning the reliability of confessions, it concluded that such implications of leniency have nearly the same effect as outright promises of leniency (which are generally recognized as improper). DiGiambattista, 442 Mass. at 435-36, 813 N.E.2d at 524-26. It stated that "false statements concerning ostensibly irrefutable evidence against a suspect are particularly troublesome when combined with suggestions of leniency in exchange for a confession" (DiGiambattista, 442 Mass. at 435, 813 N.E.2d at 525) and held the statement to be involuntary.

The facts and reasoning in State v. Rettenberger, 1999 UT 80, 984 P.2d 1009, decided by Utah's Supreme Court, resemble those in DiGiambattista. There, however, the trial court had "found that at the time of the interrogations *** [the defendant] *** 'was more susceptible to stress and coercion than the average person.' " Rettenberger, 1999 UT 80, ¶16, 984 P.2d 1009. The police's initial tactic, after proper Miranda warnings, was to suggest that the killing could be treated as an accident and that the defendant should tell his story so that the police could persuade a judge of that. Rettenberger, 1999 UT 80, ¶2, 984 P.2d 1009. Although the police had no physical evidence

implicating the defendant, they persuaded him that they had enough scientific evidence to convict him. Rettenberger, 1999 UT 80, ¶21, 984 P.2d 1009.

The court pointed out that the "confession contained little information that was not first provided or suggested by the interrogating officers." Rettenberger, 1999 UT 80, ¶40, 984 P.2d 1009. It noted that sufficiently overstated evidence alone can render a confession involuntary if it is such that a defendant could conclude that continued denials would be futile regardless of his or her innocence. Rettenberger, 1999 UT 80, ¶20, 984 P.2d 1009. It also noted the effect of threats of increased punishment and implications that "the murder could be recast as a crime far less serious in nature than capital homicide." Rettenberger, 1999 UT 80, ¶31, 984 P.2d 1009. It repeatedly cited a law review article (R. Ofshe & R. Leo, The Decision to Confess Falsely: Rational Choice and Irrational Action, 74 Denv. U. L. Rev. 979, 1044 (1997)) that discussed police techniques shown in practice to have produced false confessions. Rettenberger, 1999 UT 80, ¶¶ 22 through 34, 984 P.2d 1009. The court concluded that the confession was involuntary.

DiGiambattista and Rettenberger share a trait not characteristic of Illinois law: a concern with empirical evidence of what police tactics make confessions unreliable. That concern led those courts to place a much greater weight on the use of deception and implications of leniency than has any Illinois decision of which we are aware. In accord with the weight of Illinois authority, we hold that the tactics here, in light of the absence of any special susceptibility, did not invalidate defendant's statements.

As a final matter, we turn to defendant's contention that imposition of the $100 trauma center fee was unauthorized by any statute. The State confesses error on the point, and we accept that confession. Sections 27.6(b) and (c) of the Clerks of Courts Act (705 ILCS 105/27.6(b), (c) (West

2006)) authorize the collection of the trauma center fee for those receiving orders of supervision for driving under the influence of drugs or alcohol, those convicted of certain weapons offenses, and those convicted of certain drug offenses, but not those convicted of murder. A sentence provision imposed without statutory authority is void and can be attacked at any time. E.g., People v. Hunter, 358 Ill. App. 3d 1085, 1094 (2005). We therefore modify defendant's sentence by vacating the trauma center fee.

III. CONCLUSION

For the reasons stated, we affirm defendant's conviction, but modify the sentence by vacating the trauma center fee.

Affirmed as modified.

HUTCHINSON and SCHOSTOK, JJ., concur.