**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals
**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued July 7, 2017
Decided August 28, 2017

**Before**

DIANE P. WOOD, *Chief Judge*

WILLIAM J. BAUER, *Circuit Judge*

JOEL M. FLAUM, *Circuit Judge*

No. 16-2612

| | |
|---|---|
| ERNESTO VALLE, | Appeal from the United States District |
| *Petitioner-Appellant*, | Court for the Northern District of Illinois, Eastern Division. |
| *v.* | |
| | No. 14 C 4264 |
| KIM BUTLER, | |
| *Respondent-Appellee*. | Matthew F. Kennelly, *Judge*. |

**O R D E R**

An Illinois jury found Ernesto Valle guilty of first-degree murder, *see* 720 ILCS 5/9-1(a)(1), and also found that he personally had discharged a firearm that killed the victim, triggering a 25-year sentencing enhancement, *see* 730 ILCS 5/5-8-1(a)(1)(d)(iii). Valle argued on direct appeal that the trial court erred by denying a motion to suppress his confession. He contended that his will was overborne by, among other things, the interrogating officers' lies to him, his intellectual limitations, and his inability to sleep or eat while in custody. The last state court to address this issue concluded that the trial court did not err in admitting Valle's confession and affirmed his conviction. Valle renewed his claim in his petition for habeas corpus under 28 U.S.C. § 2254. The district

court denied relief but nonetheless authorized Valle to bring this appeal. We affirm the denial of Valle's § 2254 petition.

The following facts are drawn from the state-court record. The state court's factual findings are presumed correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Schriro v. Landrigan*, 550 U.S. 465, 473–74 (2007); *Jones v. Butler*, 778 F.3d 575, 578 (7th Cir. 2015).

On August 12, 2006, Jessie Lozano was shot and killed in Aurora, Illinois. *People v. Valle*, 939 N.E.2d 10, 11 (Ill. Ct. App. 2010). Police questioned Valle about the shooting, and he eventually confessed to the murder. *Id.* at 11, 14–15. Valle was charged by indictment with first-degree murder. *Id.* at 11. He then moved to suppress his confession, arguing that it was involuntary because he was particularly susceptible to coercive and deceptive tactics used by the police. *Id.* The state trial court conducted a hearing on Valle's motion to suppress his confession. *Id.* The state appellate court described the suppression hearing in meticulous detail:

> At the suppression hearing, Detective Jeff Parrish of the Aurora police testified that he was the lead investigator on the Lozano case. He started questioning defendant at around 2:55 a.m. on August 13, 2006. This interview lasted about two hours, but with breaks and changes of personnel. A second interview took place starting at approximately 10:20 p.m. the same day. Between the two interviews, the police held defendant in the booking area, in a cell with a bunk.

> The State offered digital video discs (DVDs) of the interrogation, and the court admitted them without objection from defendant. Parrish admitted that police records suggested that defendant had never previously been arrested for any criminal offenses. He agreed that the DVDs showed the presence of Special Agent Larissa Camacho of the FBI. Camacho displayed to defendant a DVD that she claimed contained a recording of an "overhear" in which defendant, at a party, bragged of his committing the Lozano shooting. She also claimed that the victim was an FBI informant. Parrish agreed that both of these claims of Camacho's were false.

> The parties stipulated that Officer John Munn of the Aurora police had interviewed Hector Delgado, defendant's friend, and that Delgado,

before the interrogation of defendant, had implicated defendant. The State then asked the court to watch the four DVDs on which the police recorded the interrogation. We now describe the contents of those DVDs.

The first disc is captioned "8/13/2006 1:34 AM." As it opens, defendant is seated in an armless metal and plastic chair. A bare desk with a desk chair is to his left. There is a window with closed blinds over the desk. He soon appears to be dozing. About 24 minutes after the start of the recording, Aurora police detectives come in and introduce themselves as "Jeff" and "Darryl." One brings out a rights waiver form and asks him about his English and reading comprehension. They go through the form, and defendant reads the first line aloud awkwardly. He reads the entire form silently and immediately signs. The detectives mostly address defendant as "dude." Defendant addresses each detective as "sir" throughout.

Asked to describe what he did the previous night, defendant says he started at a family party at his house, went to another large party on Coolidge at about 11:30, got sick and "wasted," and went home with his friends Hector and Chris at about 1:10 a.m.

The detectives tell him that people from the Coolidge party, including Chris and Hector, have connected him with a shooting, that others have picked him out of a photo lineup, and that this is his chance to tell the truth. Defendant gives more details of the evening, denying knowledge of the shooting and asking to take a lie detector test. That portion of the interview lasts for about 15 minutes.

The officers leave defendant sitting for about six minutes, saying that they are going to get a photograph of the victim. The officers then take defendant to a restroom.

After a minute, all return, and the officers start to press defendant to explain an inconsistency in his description of the evening. Defendant emphasizes that he was extremely intoxicated. The officers tell him that they already know what happened, suggest that there might have been a "legitimate reason" for the shooting, but tell him that he will not have another chance to credibly explain that reason. Defendant continues to

deny his involvement. He asks for a cigarette, and they leave, saying that they will bring him one. This portion of the interview lasts for 12 minutes and the break that follows lasts for 5 minutes.

The detectives return with an ashtray and cigarettes. They start questioning defendant about his association with the Latin Kings. Defendant says he hangs around with "Spooky Lou." They tell him that he "got [his] crown" last night, that he got "the blessing." He denies it. They ask him how he can be so disrespectful of the Kings when he had just been made a member.

The officers' tone shifts toward the intense, with frequent use of phrases like "no fucking around." They tell defendant that Hector has implicated him. Defendant starts to become upset. He swears that he was not involved. Things continue to intensify, with one detective moving his chair closer and closer to defendant's. Defendant continues his denials. The detectives reduce the intensity of the questioning and begin to suggest to defendant that the shooting might have been self-defense or otherwise excusable. One detective suggests that someone put him up to it. The other tells him that if the shooting were done in the heat of the moment or in self-defense, it would not be premeditated. They tell him that they are going to give him a while to consider his position, and they leave. He asks for water, but does not get it. This portion of the interview lasts for 10 minutes.

After a break of about seven minutes, two new detectives, "Bill" and "John," come in. They tell defendant that they are the ones who have been interviewing Hector. The tone is calm again. Defendant describes the evening again, and they tell him that Hector's story is very different. They say that "Hector spilled it" and that he is "putting shit" on defendant. They also say that others at the party also say his story is wrong. They tell him that they already know that he got his crown.

One detective takes a sympathetic tone. He pushes the idea that the shooting was "an accident" and that defendant was a victim himself because the Kings pressured him into it. He suggests that the Kings might have hurt him if he did not do as they said, and that the shooting therefore was self-defense. Then he suggests that defendant did not intend to kill

the victim and says that an accident is very different from premeditated murder.

This detective now tells defendant that Hector completely betrayed him and that Chris has made a deal. The other detective takes a harsher tone. He tells defendant that, if he denies getting "blessed," the Kings will "violate" him. The other detective stands up, moves close to defendant, and starts shouting at him. He continues to suggest that the shooting was an "accident." He says that the difference between an accident and a premeditated murder is what defendant can use to avoid a life sentence. Next, he turns to arguing that the Kings' hierarchy is treating defendant as "their little bitch."

Defendant begins to repeatedly ask the detectives what they want him to say. One detective asks for "something to work with." This detective shouts at defendant repeatedly, telling him that he is the victim, but not to "waste [his] breath" denying that he did it. One detective asks the other if it "was a chrome 0.45 or black" and the other says "black." Defendant tells the detectives that he is cold; he also asks for water. The detectives leave. This portion of the interview lasts approximately 28 minutes. After five minutes, they bring him a blanket and water. Defendant pulls the blanket around him.

The next disc starts at, by its caption, about 3:45 a.m. Defendant has the blanket around him and his head down. He appears to be sleeping. The original detectives return six minutes after the recording starts. They tell him that the other detectives think that he deserves another chance to explain himself, but that they are skeptical. They tell him that an explanation now will "carry a lot of weight." Defendant continues to deny his involvement, and the detectives leave, displaying frustration with him. This portion lasts for seven minutes.

The next disc starts, according to the caption, at 9:17 p.m. The recording opens with two officers escorting defendant into a room much like the first, but windowless. They state that the time is 10:17 p.m. They leave him sitting in an armless chair. He pulls his arms inside his T-shirt and crosses them. After about six minutes, two men and a woman enter. They introduce themselves as Jeff Parrish ("Jeff" from the first night) and

"Rob Wallace," both of the Aurora police, and Special Agent Camacho of the FBI. Camacho tells defendant that it is a crime to lie to her. She displays a compact disc (CD) or a DVD in a plastic case and tells defendant that someone at the party was wearing a wire that picked up defendant bragging about the shooting. She also says that the victim was her informant, making the matter potentially a federal offense.

Camacho suggests to defendant that the matter can be kept at the state level, but tells him that, in a federal prosecution, he will get "85% time." She says that she knows that defendant "shook up" with "Ric Dog" and that he "got the blessing." She suggests that if he can convince the Aurora officers that he did not know that he was killing an FBI informant, the FBI will be willing to leave it as a state matter. Like the Aurora detective, she also suggests that the shooting was an "accident."

Defendant describes his actions with little change from his previous tellings except he says that at "Chonnie's" he was telling a "bullshit lie" about what he had done and did not think that anyone had really been shot. Camacho tells him that his choices are either they will play the tape in court, she and her informants will testify, and he will be "fucked," or he can tell the truth. Defendant asks whether, if he says what they want him to, they will go easy on him. They say that maybe there is a "legitimate reason" the shooting happened. Defendant offers to take a lie detector test. He is crying, or nearly so. Camacho says that Ric Dog did not "shake up" with him for no reason and starts reciting who was at the party. Defendant becomes angry and suggests that, if they bring in Chris and Hector, everything will be cleared up.

They say again that defendant was seen "shaking it up" with Ric Dog, the Latin Kings' enforcer. Defendant admits shaking up. They tell him that they found gunshot residue in the car. One detective tells him to "get it off his chest." He says that the best thing defendant can say is "'I screwed up.'" Defendant says, "I screwed up."

Defendant says that "it was a mistake" and that he "thought it was someone else." They ask him where the shooting happened. He says that he does not know, that it was somewhere on the east side. They ask him if it could have been near Liberty and the Oak Park School. He agrees that it

could have been. He says he met with Hector and Chris at a party at his house, went from there to the party with the Kings, and stayed there awhile. He then left, sitting in the front seat of Hector's car with Hector driving and Chris in back. In the back of the car was a 9–millimeter Glock semiautomatic with a chrome finish, a "nation's" (gang-owned) gun.

Defendant saw a "guy" in a vehicle going the opposite direction and started "mad dogging"[1] him. He got out of the car and Hector drove around the block. He shot three times at the vehicle. He did not know at whom he was shooting. The victim was the first person he saw, and he could not see the vehicle. He ran back to Hector's car without seeing what happened to the vehicle or the driver.

Defendant tells the three that they did not go back to the party after that, but Camacho tells him that of course he did. He agrees with her. He says that, back at the party, he "shook up" with Ric Dog. He agrees that Ric Dog was the Kings' enforcer and had given him his crown on the spot. One detective says that defendant must have given Ric Dog a "play by play," but defendant says that he had just said that he had "hit him up."

Questioned about how sure he is about the appearance of the weapon, defendant becomes less certain, saying that he thought that the detectives had told him that the weapon was a 9-millimeter Glock. They ask him if he has ever committed any other murders. He says that he has not. This portion of the interview lasts for 33 minutes.

The caption now says that it is 10:18 p.m. Eleven minutes after the recording begins, detectives enter and ask defendant to identify photographs. Asked to go over the details again, he says that he does not remember the locale of the shooting or where in the street he was standing when he shot. He says that he, Chris, and Hector left the party at his house at about 9:30 or 10 p.m. They went to "Spooky Lou and Chonnie's" house and stayed there for about an hour. They left with Hector driving and cruised around for less than an hour. Hector told him that there was a gun, a semiautomatic, behind the seat. Defendant is now not sure whether

---

[1] Apparently, staring at a person threateningly.

the gun was black or chrome. He now tells the detectives that the shooting took place before they ever went to the party on Coolidge.

Describing the shooting again, he says that Hector pulled over, let him out, and told him that the car would be around the corner. A car came toward him, and he shot three times at it as it was coming up to him; he shot from "far away." He could not say anything about the vehicle. He ran to Hector's car, which was waiting for him around the corner, and got in. He said, "let's go to the spot." Only then did they go to the party. The first person he saw was Ric Dog. He said to Ric Dog that he "hit someone up," and Ric Dog "welcomed [him] home." He, Hector, and Chris all "shook up" with Ric Dog. They stayed for less than 30 minutes. They left, he was driven to his home, and the others went to White Castle. He passed the gun to Hector in the car. Defendant tells the detectives that the victim was just a person passing down the street. He was not sure exactly what it meant to have "come home."

The detectives ask defendant how they had treated him. He says that he could not eat in booking, but agrees that they had offered him food. After a short break, the detectives ask defendant if he can verify the conversation that Camacho recorded. He says he cannot remember any details. He asks if he can lie down, and they say that they can bring him a blanket to lie on the floor. The officers leave 38 minutes after the recording begins, and 56 minutes after it begins, they return to take him to booking. They are sympathetic, offer him food, and say they will arrange to let him talk to his family. They leave, and nothing more happens until the recording ends.

After watching the recording, the court continued the hearing for several days. Resuming the hearing, it ruled that the State shifted the burden of showing involuntariness to defendant.

Defendant then testified that he had been 18 years old on August 13, 2006. He had graduated from East Aurora High School, but had been in special education all four years because he "had trouble understanding." He had never before been arrested or interrogated. The police had taken him into custody at around 1 a.m. When arrested, he had been in bed for a few minutes and was not asleep. He had slept until noon

on August 12. When the police took him into custody, he had recently been at a party and had drunk four or five beers. He did not know when he had last eaten. While he was in the detention cell, he did not eat because he was not hungry. He was tired, but could not sleep.

After another recess of several days, the court ruled that the inculpatory statements were admissible. It stated its factual conclusions. It found that the officers did not falsely suggest sympathy. It recognized that the tone of the interviews sometimes became accusatorial and that the officers "slid their chairs into defendant's space" and shook a finger at defendant. It noted that Camacho had engaged in deception. The court accepted the validity of the *Miranda* warnings. It found that defendant had been articulate and responsive in his answers throughout the interrogation.

*Id.* at 11–16.

A jury trial ensued. The state's case relied heavily on Valle's confession and testimony from two eyewitnesses. Valle countered with evidence that he was at home sleeping when the shooting occurred. The jury found Valle guilty of first-degree murder and also found that he personally discharged the firearm that killed Lozano. He was sentenced to 45 years' imprisonment.

Valle appealed to the Appellate Court of Illinois, arguing that his confession was coerced in violation of the Fifth and Fourteenth Amendments. Specifically he argued that his confession should have been suppressed because he (1) was 18 years old, (2) had never been arrested or interrogated previously, (3) spent much of his time in school in special education classes, (4) had consumed several beers prior to the interrogation, (5) did not eat because he was too tired, and (6) was subjected to "subterfuge, trickery, and coercion" by police "in their attempts to obtain a confession." The appellate court evaluated the trial judge's decision under a bifurcated standard that gave deference to the judge's factual findings but not his legal conclusions. *Valle*, 939 N.E.2d at 18. The appellate court also recognized that, in reviewing whether Valle's confession was voluntary, it

must consider the totality of the circumstances of the particular case; no single factor is dispositive. Factors to consider include the defendant's age,

intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the presence of *Miranda* warnings; the duration of the questioning; and any physical or mental abuse by police, including the existence of threats or promises.

*Id.* at 17. The appellate court then concluded that the trial judge's tacit finding that Valle was not unusually susceptible to the officers' tactics was not against the manifest weight of the evidence. *Id.* at 20. The court acknowledged that "police aggression and deception are factors that weigh in favor of finding involuntariness" but it concluded that the degree of each employed while questioning Valle had not rendered his confession involuntary. *Id.* at 20–21. Last, the court addressed Valle's contention that the officers had increased the chances of a false confession, but it concluded that Illinois does not weigh police deception as heavily as other states that had invalidated confessions under similar circumstances. *Id.* at 22.

The Supreme Court of Illinois denied further review, *People v. Valle*, 239 Ill. 2d 584 (Ill. 2011), and after exhausting other postconviction claims not relevant here, Valle filed this § 2254 action. He claimed that allowing his confession into evidence "denied his constitutional right to due process and a fair trial." The district judge concluded that the Illinois appellate court's decision rejecting this contention was neither contrary to nor an unreasonable application of clearly established federal law and denied Valle's petition. The judge opined that the tactics used by Valle's interrogators might be more likely to lead to a "false confession" but recognized that the Supreme Court has not held that the voluntariness analysis must take into account whether police tactics increased the probability of precipitating a false confession.

On appeal Valle argues that the decision of the Illinois appellate court was both contrary to and an unreasonable application of clearly established federal law. He insists that his motion to suppress should have been granted based on the fact that the police lied and were aggressive.

A federal court cannot issue a writ of habeas corpus on a claim decided on the merits by a state court unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). A state-court decision is contrary to clearly established federal law "if it applies a rule that contradicts the governing law set forth" in Supreme Court

decisions or "confronts a set of facts that is materially indistinguishable from" a Supreme Court decision but comes out differently. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *see Johnson v. Pollard*, 559 F.3d 746, 752–53 (7th Cir. 2009). And an unreasonable application of clearly established federal law "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quotation marks and citation omitted); *see McManus v. Neal*, 779 F.3d 634, 649 (7th Cir. 2015). The petitioner bears the burden of showing that the state court's decision involved an error "well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see Quintana v. Chandler*, 723 F.3d 849, 855 (7th Cir. 2013). This deferential approach applies even if the state court did not fully articulate its reasons or gave no reasons for its outcome. *See Harrington*, 562 U.S. at 102; *Hanson v. Beth*, 738 F.3d 158, 163–64 (7th Cir. 2013).

The Illinois appellate court's decision is not contrary to clearly established federal law. Valle accuses the state court of failing to "discuss, cite or consider a single federal opinion," but his argument lacks merit because the cases relied on by the state court and the factors those decisions identify are consistent with Supreme Court precedent. *See Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (explaining that a "state court need not even be aware of" Supreme Court precedents so long its reasoning and result do not contradict them); *Gilbert v. Merchant*, 488 F.3d 780, 793 n.2 (7th Cir. 2007). The state appellate court correctly recognized that the voluntariness analysis requires evaluating the totality of the circumstances and recited a range of relevant circumstances. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Carter v. Thompson*, 690 F.3d 837, 843 (7th Cir. 2012). And it properly recognized that no single factor is dispositive. *See Brown v. Illinois*, 422 U.S. 590, 603 (1975); *Gilbert*, 488 F.3d at 793. Valle also has not identified a decision—nor have we found one—of the Supreme Court with a set of indistinguishable facts that obtained a different result.

Valle next insists that the state appellate court unreasonably applied the totality-of-the-circumstances test. He primarily takes issue with the interrogating officers' lies, which standing alone, he argues, should have led to suppression of his confession. But the appellate court did not unreasonably apply clearly established federal law because nothing suggests that the court impermissibly balanced the factors before it. The appellate court correctly recognized that police deception is one factor to be considered, *see Frazier v. Cupp*, 394 U.S. 731, 739 (1969), and it reasoned that the tactics used by Valle's interrogators were not so coercive given his lack of any special susceptibility to police tactics. *Valle*, 939 N.E.2d at 20–21. We have "repeatedly held that a

law-enforcement agent may actively mislead a defendant in order to obtain a confession, so long as a rational decision remains possible." *United States v. Sturdivant*, 796 F.3d 690, 697 (7th Cir. 2015). The officers' lies to Valle misrepresented the strength of the evidence they had gathered against him, but lies concerning a suspect's connection to the crime are least likely to render a confession involuntary. *United States v. Ceballos*, 302 F.3d 679, 695 (7th Cir. 2002); *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992). Moreover, while Valle argues that the police promised him that a confession would result in a lighter sentence, that contention is belied by the appellate court's description of the interrogation. Rather, the interrogators suggested that the shooting might have been an "accident" and that Valle's explanation "would carry a lot of weight." These techniques are similar to others we have said fall short of a false promise of leniency that could invalidate a confession. *See United States v. Villapando*, 588 F.3d 1124, 1128–29 (7th Cir. 2009) (rejecting claim that false promise of leniency was made by officer who stated she would "sit down" with law enforcement to "work this out" and also said "we don't have to charge you"); *United States v. Rutledge*, 900 F.2d 1127, 1128, 1131 (7th Cir. 1990) (declining to suppress confession where officer told suspect that "his cooperation would be helpful," since "the law permits the police to pressure and cajole, conceal material facts, and actively mislead—all up to limits not exceeded here").

Valle also argues that the state court unreasonably applied the totality-of-the-circumstances test because he was held for 36 hours and was questioned during two "lengthy" interrogation sessions, he was "probably" still drunk from consuming beers before his arrest, and his time in special education classes during high school signal a limited intellectual capacity. But he is asking us to reweigh the factors considered by the appellate court as if § 2254(d) does not exist. The appellate court considered these and other circumstances when it described the interrogation and concluded that Valle was not especially susceptible to police tactics. *Valle*, 939 N.E.2d at 20; *see also Carter*, 690 F.3d at 843 (concluding that the appellate court did not violate *Schneckloth* when it did not repeat all the relevant background facts in its analysis of whether the petitioner's confession was voluntary). Valle has not pointed to any decision suggesting that this approach was an unreasonable application of clearly established federal law.

AFFIRMED.