2021 IL App (1st) 172416

No. 1-17-2416

Opinion filed November 18, 2021

Fourth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 21040 |
| | ) | |
| TYRECE COLEMAN, | ) | Honorable |
| | ) | Carl B. Boyd, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justices Rochford and Martin concurred in the judgment and opinion.

**OPINION**

¶ 1     On May 25, 2017, after a jury trial, defendant Tyrece Coleman was convicted of the first

degree murder of Taiwan Jones. The jury made a separate finding that defendant personally

discharged a firearm that proximately caused Jones's death. On August 28, 2017, the trial court

sentenced defendant to 25 years' imprisonment for the first degree murder charge and an additional

25 years' imprisonment for the firearm enhancement for an aggregate 50-year sentence.

¶ 2     Timely notice of appeal was filed on September 22, 2017. We have jurisdiction pursuant

to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois

Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. Mar. 12, 2021), governing criminal appeals.

¶ 3     For the reasons that follow, we reverse defendant's conviction and remand for a new trial.

¶ 4                                    I. BACKGROUND

¶ 5                         A. Defendant's Motion to Suppress Statements

¶ 6     On March 27, 2012, defendant filed a motion to suppress statements. Defendant's motion alleged that he was improperly interrogated after invoking his right to counsel. Defendant attached to his motion a transcript of contents of his electronically recorded interview (ERI) with Detectives Darryl Hope and Bob Dolton. The transcript contains the following exchange:

> "[THE DETECTIVE]: Well, that's what we're trying to figure out, young man.
>
> DEFENDANT: Well, I hope you all get your mother*** test. Can I call my lawyer?
>
> [THE DETECTIVE]: Is that what you want to do?
>
> DEFENDANT: Or call my momma and then call my lawyer. And you can talk to her.
>
> [THE DETECTIVE]: Talk to your mom?
>
> DEFENDANT: Uh-huh.
>
> [THE DETECTIVE]: Do you want us to call your mom?
>
> DEFENDANT: Yeah, you can call my OG. My OG gonna call my lawyer and all that other s***. So I'm ready to make a phone call, sir.
>
> [THE DETECTIVE]: So you don't want to talk to us anymore?
>
> DEFENDANT: I'll, I'll sit here and talk to you all with, with—

[THE DETECTIVE]: No, we don't want to sit here and chit chat. I mean if you want to talk to us, we gonna talk about—

[THE DETECTIVE] : If you want to talk, we can talk. If you don't want to talk to us you don't have to talk to us.

DEFENDANT: D***, I just told you all, man, what I knew, man, for real, man. I don't know who the f*** shot the dude, man. I don't know—like I said, man, none of my clique is even parked by me, you know what I'm saying, everybody ***."

¶ 7    On August 15, 2012, the trial court held a hearing on defendant's motion to suppress statements. Neither side presented any live testimony but relied on the ERI and the transcript to support their respective positions. In support of his motion, defense counsel maintained that the police did not scrupulously honor defendant's request for counsel, while the State maintained that defendant did not unequivocally invoke such right.

¶ 8    In denying defendant's motion, the court made the following findings:

"THE COURT: All right, the Court did read the motion, as well as I reviewed the video quite thoroughly, and the video has a transcript of it.

The pertinent parts are here stating that the defendant, among other statements, initially says: Can I call my lawyer, with a question.

The police responded to that in the form of: Is that what you want to do?

And the answer was: Or call my mama, and then call my lawyer, and you can talk to her.

Question again: Talk to your mom?

Answer: U-huh by the defendant.

And question: Do you want us to call your mom?

Answer: Yeah.

And other statements were somewhat made, and ultimately it was just thrown down the fact, Do you want your lawyer, or do you want to talk to us, or do you want your lawyer?[1] And he continued talking.

But the issue here is namely is defendant's statement here ''Can I call my lawyer' in the form of a question, and then he puts in 'Or call my mama.' Then it somewhat turned into him asking to speak to his mother.

I've reviewed the pertinent case law, and basically the statements must be unambiguous and unequivocal. The statements here are not unambiguous and are not unequivocal as stated. Contingencies are put forth here in the form of questions and then throwing his mother into it.

Certainly the case law does not indicate defendant has a right to talk to his mother. The case law says he has a right to talk to a lawyer if he so wishes to have one. The defendant does not specifically at any juncture simply state I wish to talk to my lawyer. If that were his statement, it would be game over; police are out of the room; all questioning stops. It didn't happen that way. Things became qualified by his statements.

---

[1]The transcript only references a portion of the ERI. The non-transcribed portion of the ERI that closely follows where the transcript leaves off establishes that defendant only agreed to talk to the detectives after stating, "I still want a phone call," in response to which he was told, "Yeah, well the phone call will be in a little while, we've got some investigating to do but if you really want to talk to us or you don't want to talk to us. Either you want your lawyer here or you don't."

I have to look at all factors here by all of the questions that occurred together; and therefore, based upon this, it's the Court's position that the defendant's motion here is not enough to succeed, and the Motion to Suppress Statements is denied."

¶ 9 Defendant filed a motion for new trial on June 27, 2017, in which he preserved his claim of error resulting from the trial court's denial of his motion to suppress his statement.

¶ 10                                    B. Evidence Adduced at Trial

¶ 11 On June 3, 2010, 32-year-old Dayonne Perry worked at a car wash and lived in the south suburbs with his mother. After he got off from work, Dayonne went home, changed his clothes, and drove his 1997 blue Buick Le Sabre car to the home of his best friend, Taiwan Jones, in South Holland, Illinois. Later that evening, the two decided to meet girls, talk, and dance at a club in Dolton called "Mr. Ricky's." Mr. Ricky's was located across the street from another nightclub, "Secrets."

¶ 12 After spending about an hour at Mr. Ricky's, Taiwan and Dayonne went to a restaurant to eat and then drove around to various gas stations where they purchased beer, whiskey, and loose cigarettes. After the clubs closed at about 2:30 or 3 a.m., Taiwan and Dayonne drove around "looking for some more females." When Dayonne reached the intersection of 142nd Street and Grant Street, he saw a woman whom he claimed to have met earlier that evening at Mr. Ricky's and who was identified at trial as Crystal McKire. Crystal was walking towards a gold two-door Sunfire car with another woman who would be identified at trial as her cousin, Kristin McKire. Dayonne pulled his Buick up to the Sunfire facing the opposite direction and told Taiwan that he was going to get Crystal's phone number. Taiwan said that he was going to talk to the other girl.

Dayonne testified that he also saw a guy on the sidewalk by the passenger side of the Sunfire wearing blue jeans and a red shirt.

¶ 13    While Dayonne left his car running, he approached Crystal, and the two exchanged phone numbers. Dayonne could not hear the substance of the conversation between Taiwan and Kristin because music was playing in the Sunfire. Dayonne saw the guy in the red shirt cross the street and walk over to a white Chevy Caprice that pulled up and parked behind Dayonne's car after making a U-turn. While Dayonne and Taiwan were talking to the girls, the door of the passenger side of the Sunfire opened, and the head of a person (later identified by Dayonne as defendant) wearing a brown hoodie popped up.

¶ 14    Defendant approached Dayonne and Crystal and asked why she had given Dayonne her phone number. Defendant sounded angry. Crystal ignored him. Defendant walked around the rear of the Sunfire, to where Taiwan was still talking to Kristin. The guy in the red t-shirt, still standing next to the Caprice, asked defendant, "was he good?" Defendant replied, "I'm good."

¶ 15    Dayonne, who had decided to tell Taiwan that they should leave because things did not "seem right," began walking toward Taiwan. From a distance of about eight feet away, Dayonne saw defendant pull a pistol from his waistband and shoot Taiwan twice in the stomach. Taiwan fell to the ground after being shot.

¶ 16    When defendant made eye contact with Dayonne, he quickly turned and ran back to his car. When Dayonne reached his car, he felt a bullet strike his stomach. Dayonne fell into his car, shut the doors, and was shifting gears when another bullet struck him in the back of his head after entering through the car's rear window. Dayonne drove to a stop sign and exited his vehicle upon reaching the Sharks restaurant parking lot. Dayonne yelled for help, flagged down the police,

provided a description of the Sunfire, and told the police that his buddy was shot in the chest on Grant Street. Dayonne also described defendant and told the police that he was wearing a brown hoodie.

¶ 17 A nurse who was leaving a club saw Dayonne and told him to sit down and remain calm. Dayonne removed a fragment from his head and saw blood on it. His stomach was also bloody. Dayonne was transported to the hospital by an ambulance and treated for his gunshot wounds. Two days later, doctors removed a bullet from his head.

¶ 18 On June 3, 2010, 34-year-old Kristin McKire worked as a package handler for UPS. At 10 p.m. that evening, Kristin was visiting her cousin, Crystal McKire, at Crystal's house in Harvey, Illinois. Kristin drove to Crystal's house in her 1999 Pontiac Sunfire. While Kristin, Crystal, and another friend, Sherrell, were drinking, defendant called Crystal and invited her to a party at Secrets nightclub in Dolton. When Kristin visited Crystal on the weekends, she would regularly see defendant, whom she had known for about four years. Crystal and Kristin decided to go to the party and drove to defendant's house on Winchester Street in Harvey to take him to the club with them.

¶ 19 On the way to the club, the three stopped at a gas station so that defendant could purchase a black t-shirt because the white t-shirt that he was wearing would not gain him admittance to the club. Defendant gave Kristin $5 to buy the shirt, and she went inside and made the purchase. Kristin testified that defendant also had a brown hoodie with him that evening.

¶ 20 As the three resumed driving to the club, Crystal asked defendant whether he was carrying a gun. Defendant replied in the affirmative, stating, "I'm packing. You know I'm packing all the

time." Kristin then said, "Why the f*** he bring a gun in my car?" to which defendant told her, "Shut the f*** up. I'm not riding back with you."

¶ 21    Upon arriving at the club, the parking lot was full, so defendant directed Kristin to park about two blocks away on Grant Street. The three attempted to enter the club at about 11 p.m., but Kristin was refused entry because she wore a brown jogging suit that violated the nightclub's dress code. Defendant went inside the club and got a VIP bracelet that allowed him access to an upstairs area inside the club while the girls went back to Kristin's house to change her clothes.

¶ 22    Kristin and Crystal returned to the nightclub at about midnight and were granted entry. Defendant paid their admission fee and bought the girls a drink. The girls stayed downstairs while defendant came and went from the upstairs VIP area. Neither Kristin nor Crystal went to the VIP area.

¶ 23    At one point in the evening, Kristin saw defendant with a man in a red t-shirt. The man danced with Crystal. About 2½ hours later, Kristin and Crystal decided to leave the club because some type of smoke released into the air was burning Kristin's eyes. Defendant did not go with Kristin and Crystal. While Kristin and Crystal were walking across the club's parking lot, Kristin stumbled on some rocks, fell, broke the three-inch heel of one shoe, and wound up losing both shoes. Kristin testified that she "felt a little buzz, but I wasn't drunk."

¶ 24    Before reaching her car, Kristin noticed that defendant was walking about 15 feet behind them. As Kristin approached the driver's side of her car, she saw Crystal talking to the man in the red t-shirt by the passenger side. Kristin also saw another man she did not know (Taiwan) standing across the street. Taiwan began talking to Kristin, asking her, "Hey, what's up?" After the two had

a brief conversation, Kristin heard defendant arguing with Crystal, calling her a "stupid a*** bi***." Defendant told both Crystal and Kristin to "get in the f*** car."

¶ 25    Defendant then walked around the back of Kristin's car to the driver's side where she and Taiwan were standing. After defendant and Taiwan had a brief conversation, the substance of which Kristin ignored, defendant pulled a gun from his waistband and shot Taiwan while standing face-to-face with him. Taiwan fell to the ground. Kristin testified that Taiwan did nothing to provoke being shot.

¶ 26    Kristin ducked down and got into her car, which Crystal had already re-entered. Kristin wanted to drive away without defendant, but she had difficulty starting the car's ignition. While Kristin tried to get away, defendant was swearing at the girls and trying to enter the vehicle. He finally succeeded by pushing up the front passenger seat where Crystal was seated and sliding into the rear seat. While all three were sitting in the car, Kristin heard three more shots fired. Defendant continued swearing at the girls and told them to "get the f*** out of there." Kristin managed to start the car, and as they drove down Sibley Boulevard, the three continued to argue. When Kirstin reached Grant Street, she saw the police behind her, stopped, and threw her keys out of the car.

¶ 27    On June 4, 2010, at approximately 2:37 a.m., while monitoring traffic in Dolton, Sergeant Mark Kozeluh responded to an assist call of a shooting that had just occurred in the area of 142nd Street and Lincoln Avenue. Based on a radio communication, Sergeant Kozeluh was looking for a brown Pontiac Sunfire. While driving eastbound on Sibley Boulevard, Sergeant Kozeluh observed a vehicle matching the broadcast description traveling eastbound at a high rate of speed.

When he conducted a traffic stop of the car at Sibley Boulevard and Chicago Road, Sergeant Kozeluh observed two female occupants in the front of the vehicle and a male in the rear seat.

¶ 28    When the driver (Kristin) exited the car, she began yelling at the male (defendant) seated in the rear seat. A second woman (Crystal) was sitting in the front passenger seat. The police detained all three.

¶ 29    After Kristin was arrested and transported to the police station, she provided an oral and handwritten statement concerning the events that transpired to the police and an assistant state's attorney. Kristin, a mother of three, was held in the police station for three days and told that she could not go home until she gave a statement. Kristin was kept unhandcuffed in an unlocked conference room, provided food and beverages, and was allowed to sleep and use the bathroom. Kristin testified that she was neither threatened nor promised anything in exchange for her cooperation and was treated fairly by the police and the assistant state's attorney. It was Kristin's decision to give a written statement. Kristin further testified that she was not told what to say or forced to testify either before the grand jury or at trial

¶ 30    On June 4, 2010, at 3 a.m., Officer Michael Johnson transported defendant to the Dolton police station. At 3:25 a.m., defendant was placed in a cell in the lockup area of the police station.

¶ 31    Meanwhile, on June 4, 2010, at about 5 or 6 a.m., Sheila Carroll learned that her son, Taiwan Jones, was shot and killed. The parties stipulated that Dr. Young Kim, a forensic pathologist, and an assistant medical examiner for the Lake County Coroner's Office, conducted an autopsy on Taiwan Jones on June 4, 2010. Dr. Kim concluded that Taiwan died due to a gunshot wound to his left chest and declared the manner of death was homicide. Taiwan's toxicology report was positive for alcohol in the amount of 0.109 and negative for narcotics.

¶ 32    On June 4, 2010, at about 7:09 a.m., defendant was removed from his cell to be tested for gunshot residue (GSR). The police also tested his brown hoodie for GSR. No gunshot residue would be detected on defendant's hands or his brown hoodie.

¶ 33    A total of about 12 investigators were assigned to investigate this matter. Between the time that defendant was placed in a cell at the Dolton police station on June 4, 2010, at 3:25 a.m. and June 5, 2010, at 9:30 p.m., defendant was interviewed a total of six times: on June 4, 2010, at 7:25 a.m., 11:13 a.m., and 2:30 p.m., and on June 5, 2010, at 9:53 a.m., 3:40 p.m., and 9:30 p.m. Only during his final interview did defendant make an inculpatory statement.

¶ 34    Then-Assistant Commander Matthew Gainer of the Illinois State Police Major Crimes Task Force conducted the final two interviews of defendant.[2] On June 5, 2010, at 3:40 p.m., Assistant Commander Gainer had his first conversation with defendant, which lasted about 10 minutes. The interview resumed nearly six hours later, at 9:30 p.m. At this time, defendant hugged Assistant Commander Gainer and was sobbing. Defendant said that he wanted to apologize to the victim's mother because he was sorry for his actions. Assistant Commander Gainer testified, in part to the following:

> "ASSISTANT COMMANDER GAINER: What he told us is that he had left a club and while walking back to the car that he came to the club in he was going to—to the vehicle with two female friends. As he was approaching the vehicle a Pontiac—one of the females was talking to a couple of men in the street. Mr. Coleman went into the Pontiac. He retrieved a 357 revolver. He went then to the—he retrieved the revolver from the passenger side. Then he walked around to

---

[2]At the time of his testimony, Gainer held the position of Master Sergeant.

the driver's side of the vehicle, was arguing with his female acquaintances or friends trying to get the driver to enter the car.

As he was arguing with the females he became at one time face-to-face with the victim. At which time he pulled the 357 revolver and fired it one time at the victim.

\* \* \*

He said he then went to get into the Pontiac and he handed the 357 to his friend Mike and then his friend Mike fired four or five rounds at a Buick that was leaving the scene down Grant Street."

¶ 35    Assistant Commander Gainer identified People's exhibit No. 50 as a true and accurate copy of defendant's videotaped statement. The videotape was published to the jury.

¶ 36    On June 5, 2010, at about 11:37 p.m., Dayonne went to the police station and identified defendant from a lineup. Dayonne testified that neither he nor Taiwan had a gun that evening and that neither did anything to cause defendant to shoot Taiwan. Dayonne admitted that he had a prior conviction for driving under the influence.

¶ 37    On August 27, 2010, Kristin viewed a lineup but was unable to identify anyone as the man in the red shirt.

¶ 38    In addition to the foregoing, the State presented the testimony of Nathan A. Russell, who was previously convicted of armed violence and arrested in Kendall County on February 26, 2015, for multiple offenses. The greatest was a Class X charge of possession of a controlled substance with intent to deliver. Russell testified that due to his cooperation in an unrelated armed robbery case, the plea offer on his pending charges had improved from an initial plea offer of 25 years to

22 years in the Illinois Department of Corrections. Russell testified that he also provided information to the Chicago Police Department regarding an unrelated murder. Although neither the Cook County State's Attorney's Office nor the Kendall County State's Attorney's Office had promised Russell anything in exchange for his testimony in this matter, Russell hoped that his cooperation would result in a further sentence reduction on his pending charges.

¶ 39    Russell testified that in November 2016, while housed in the Kendall County jail, he was in a 10-person pod with defendant, whom he knew by the name of "Holler." Defendant's bunk was right next to Russell's bunk, and the two were housed together for about three weeks. During this time, defendant and Russell had a private conversation in which defendant said that he was from Harvey and that it was a tough area compared to Kendall County. Russell recounted what defendant told him about this crime:

> "[ASSISTANT STATE'S ATTORNEY (ASA)]: What did Holler specifically say he had done?
>
> RUSSELL: I'll mention what you're in here for. There's not much to tell on my case. I was leaving the club with two b***, his words.
>
> ASA: Did he say what the b*** were doing?
>
> RUSSELL: No. He was leaving with them, walking with them and some guys started hollering at them. And he turned around and starting busting. He used his finger like a gun."

¶ 40    Additionally, when Russell asked defendant what kind of case the State had against him, defendant said that the two girls were witnesses but that "witnesses don't usually show up at trial" and that "witnesses get got." Russell wrote down what defendant said on a piece of paper and put

it in a manila envelope with his legal papers marked "legal work." Russell identified the paper as People's exhibit No. 49. Russell admitted that he wrote down what defendant said to help himself.

¶ 41   The parties stipulated that the same .38/.357-caliber gun was the source of a fired bullet recovered from the area of the shooting, a fired jacket fragment and two metal fragments recovered from the driver's side taillight of the Buick, a fired bullet recovered from the Buick's interior driver's side door, a fired bullet recovered from the back of Taiwan Jones at his autopsy, and a fired jacket fragment recovered from the clothing of Dayonne Perry.

¶ 42   The State rested, and defendant's motion for a directed finding was denied.

¶ 43   Defendant elected not to testify. The parties stipulated that defendant gave videotaped interviews to the police on June 4, 2010, at 9:53 a.m. and 11:13 a.m.

¶ 44   The defense rested, and both sides presented closing arguments. With respect to defendant's confession to Assistant Commander Gainer, the State argued:

> "THE STATE: But further, you also heard another key, important piece of evidence. This defendant's own words. You got to see 20 plus minutes of this defendant's account of what happened that day. You heard him admit and to confess to shooting Taiwan Jones on June 4, 2010.
>
> But I want you to pay particular attention to the things that he said that corroborates exactly what Kristin and Dayonne said occurred. He was asked the question Did you shoot that man? Answer: Yes, man. He was asked the question, How many times did you pull the trigger? Answer: One time.
>
> Each of those two corroborates what Kristin said and what Dayonne said. How close were you? Four feet away. What did Dayonne tell you? They was face

to face. He took a couple steps back and fired. Question: Did you move towards him to shoot? No, I moved back to push shorty in the car and told her let's go.

Everything the defendant told the police as to what happened is the same thing that Kristin and Dayonne said occurred on June 4th. There's no question that defendant performed the act which caused the death of Taiwan Jones. So that first proposition has been proved.

And ladies and gentlemen, we know that the cause of death to Taiwan Jones was the one bullet to the chest. And how do we know that this defendant is the one that personally discharged the firearm? Kristin told you. Dayonne told you. And, additionally, he told you. Not once. Not twice. But three separate times in his confession he admitted to shooting."

¶ 45    In rebuttal, the State argued:

"THE STATE: And then he tried to keep Dayonne from coming in here by giving the gun to a buddy and having him shot. He shot him—he got shot in the head, and he got shot here. But he lived. And he came to court and testified. So against what he tried to do, Kristin, brave came forward and testified.

Mr. Perry survived being shot in the head, in the side, and came forward. That's not what he intended. He intended one to be dead and the other one, the girl, not to come. But Kristin did come forward. And what? Kristin is a liar. Dayonne is a liar. The police department. This whole task force are liars. The State's Attorney are all liars.

When they brought the defendant Tyrece Coleman into that interview, look at his actions. You know, immediately he breaks down, starts hugging the officer. I'm sorry. He's weeping and crying. I didn't mean to do it. I must have blacked out. Now, you don't even get into what he actually said. Just look at his demeanor and his actions. He's got guilt all over his face. His actions. I'm sorry. I got to get this off my chest. I'm hugging him.

Is that an innocent person if he didn't do it? No, act normal. He wants to get all this off. Look at how he behaves. We won't even talk about what he said, his actions in this case. He knew he had been boxed in. There was no way out. The police had interviewed witnesses. He had gone through a lineup. He knew I have to tell them what happened.

I mean, the police weren't talking to him 24 hours a day. Yes, they talked to him four times. He denied it four times. But he wasn't being threatened. He wasn't being beaten. He wasn't being starved. In this case, he denied it.

And the officer said, He slept the whole night. They brought him out again. And what do you think the officers just stopped their investigation? As Kristin said, they were interviewing, taking people to the grand jury, interviewing witnesses, there's officers in the task force doing canvassing. It's not like they're paying full attention to the defendant. We're just going to put him under a bright light and wait until he confesses.

No, it's not like TV. He was allowed to go back to his cell. Sleep. And when he finally came out, he knew he had to get this off his chest. And you heard him

crying. You heard him weeping. And he told the police, I shot him. He tried to minimize it. He didn't want to come out as a cold-blooded murder. He said something like, I don't remember or I don't remember when I actually shot him but I did it. You know, I can't picture myself doing it, but I did it.

He didn't want to come out and say I'm a cold-blooded murderer. But he said, I pulled the trigger. I was four feet away from that—someone I didn't even know, and I shot him. In his own words."

¶ 46 After the jury was instructed, one juror informed the court that she believed she could not continue to deliberate because "I feel I am not completely agree [*sic*] with either side." The juror was told that she was required to continue to serve.

¶ 47 The jury began their deliberations at 3:20 p.m. on May 25, 2017. At 3:31 p.m., the jury sent a note that contained the following three questions: "1. Can we view the video of confession?," "2. Was Crystal given a supoena [*sic*],?" and "3. Was Mike charged with anything?" With respect to the second and third questions, the parties agreed that the court should reply that the jury received the evidence and should continue to deliberate. With respect to the first question, the parties agreed that the jury should be permitted to view the video.

¶ 48 While the parties and the court discussed how the jury would be permitted to watch the video, the court received another question from the jury inquiring whether they could have a video transcript and the instructions. The parties agreed that the court should provide the same response for questions two and three.

¶ 49 At 4:52 p.m., the jury found defendant guilty of first degree murder and additionally found that he personally discharged a firearm that proximately caused death to Taiwan Jones.

¶ 50 On August 28, 2017, the trial court sentenced defendant to 25 years' imprisonment for the murder and an additional 25 years' imprisonment based on the firearm enhancement for an aggregate 50-year sentence.

¶ 51                                    II. ANALYSIS

¶ 52 On appeal, defendant raises three claims of error: (1) the trial court erroneously denied his motion to suppress statements, (2) the trial court failed to conduct a *Krankel* inquiry into his posttrial allegation of ineffective assistance of counsel, and (3) the trial court improperly relied on an element inherent in the offense in imposing sentence. For the reasons that follow, we agree with defendant that the trial court erroneously denied his motion to suppress statements and that such error necessitates that this matter be remanded for a new trial. In light of our decision to remand for a new trial, we need not consider defendant's remaining claims of error.

¶ 53            A. Guiding Principles for Claims Concerning an Invocation

of the Right to Counsel

¶ 54 In *Miranda v. Arizona*, 384 U.S. 436, 471 (1966), the United States Supreme Court held that before an accused is subject to custodial interrogation, he must be advised of certain rights, including the right to remain silent and the right to consult with a lawyer and have the lawyer with him during interrogation.

¶ 55 Next, in *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), the Court held that when an accused invokes his right to counsel during interrogation, the police must immediately cease questioning unless and until "the accused himself initiates further communication, exchanges, or conversations with the police." The *Edwards* rule is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S.

344, 350 (1990). The *Edwards* rule is a "bright-line rule" intended to prevent the police from deliberately or unintentionally persuading the defendant to incriminate himself, notwithstanding his earlier request for the assistance of counsel. *Smith v. Illinois*, 469 U.S. 91, 98 (1984) (*per curiam*); *Davis v. United States*, 512 U.S. 452, 458 (1994). This bright-line rule prohibits any questioning after an accused requests counsel. *Solem v. Stumes*, 465 U.S. 638, 641, 646 (1984).

¶ 56    When an individual invokes the right to counsel, it is presumed that the individual is unable to proceed without counsel's advice. *Arizona v. Roberson*, 486 U.S. 675, 683 (1988). If the police initiate a subsequent conversation without counsel present, the accused's statements are presumed involuntary and are inadmissible as substantive evidence at trial. *People v. Woolley*, 178 Ill. 2d 175, 198 (1997).

¶ 57    In reviewing a trial court's ruling on a motion to suppress a statement, we apply the two-part standard of review announced in *Ornelas v. United States*, 517 U.S. 690, 699 (1996), and adopted by our supreme court in *In re G.O.*, 191 Ill. 2d 37, 49-50 (2000). The reviewing court reviews findings of historical fact only for clear error and gives due weight to inferences drawn from such facts by the trial court and local law enforcement officers while reviewing the court's ultimate ruling *de novo*. *Ornelas*, 517 U.S. at 699. First, we give great deference to the trial court's factual findings and will reverse the court's ruling only if the findings are against the manifest weight of the evidence. *In re G.O.*, 191 Ill. 2d at 50. For this first part of the standard of review to function properly, the trial court should make factual findings so that the reviewing court is not required to surmise what those factual findings were. *Id.*

¶ 58    Second, we review *de novo* the trial court's ultimate legal conclusion as to whether suppression is warranted. *People v. Timmsen*, 2016 IL 118181, ¶ 11. Where the facts are undisputed, we focus on the legal question of whether suppression is warranted. *Id.*

¶ 59    In deciding whether the rigid prophylactic rule in *Edwards* applies, the court must determine whether the accused actually invoked his right to counsel. *Davis*, 512 U.S. at 458. " '[A] statement either is such an assertion [of the right to counsel] or it is not.' " *Smith*, 469 U.S. at 97-98. "This is an objective inquiry, which at a minimum requires some statement that reasonably can be construed as an expression of a desire for counsel." *People v. Harris*, 2012 IL App (1st) 100678, ¶ 69.

¶ 60    An effective invocation of the right to counsel requires that the defendant articulate his desire for an attorney in a clear manner free from indecision or double meaning so that a reasonable officer under the circumstances would understand the statement to be a request for an attorney. *Id.* Furthermore, although there are no specific words that a defendant must use to invoke the right to counsel, the mere mention of a lawyer or an attorney by a defendant to the police is insufficient to invoke the right. *People v. Howerton*, 335 Ill. App. 3d 1023, 1025 (2003).

¶ 61    If a defendant's request for an attorney is ambiguous or equivocal such that a reasonable officer under the circumstances would understand only that the defendant might be invoking the right to counsel, the police are not required to stop questioning the defendant. *People v. Schuning*, 399 Ill. App. 3d 1073, 1082 (2010). When a suspect makes an ambiguous or equivocal statement, the interviewing officers may ask a clarifying question to determine whether or not the suspect actually wants an attorney. *Davis*, 512 U.S. at 461.

¶ 62    With these principles in place, we examine the particular facts of this case.

¶ 63                    B. Application of the Standard of Review in This Case

¶ 64    The State's brief alleges that defendant has failed to provide a sufficient record on appeal to support his claim of error. Specifically, the State notes that defendant did not make that portion of the ERI containing the alleged invocation of his right to counsel part of the record on appeal. The State's brief essentially argues that the absence of the ERI compels us to defer to the trial court's ruling as a "fact-based" determination involving credibility findings.

¶ 65    Defendant's reply brief indicates that he unsuccessfully attempted to obtain the ERI from the clerk of the circuit court and the Office of the Public Defender. The record on appeal suggests that the ERI at issue was not inventoried. Defendant relies on the transcript and the court's findings to support his claim of error.

¶ 66    The absence of the ERI called into question how the two-part standard of review announced in *Ornelas*, 517 U.S. at 699, and later adopted in *In re G.O.*, 191 Ill. 2d at 49-50, should be applied in this case. To properly discharge our duty as a court of review, we ordered the State to either provide the missing ERI or provide an explanation for why it could not be located. This request was based on defense counsel's lack of success in obtaining the ERI, as well as the State's exclusive reliance on the ERI and transcript to satisfy its burden of establishing the admissibility of defendant's confession before the trial court. See 725 ILCS 5/114-11(d) (West 2010).[3] As previously noted, no "live" testimony was given at the hearing on defendant's motion.

_____

[3]We note that an appellant's failure to provide a complete record on appeal may be relaxed when the failure results through no fault of the defendant. *People v. Appelgren*, 377 Ill. App. 3d 137, 142-43 (2007). Additionally, the presumption of correctness that arises from an appellant's failure to present a complete record may be inapplicable where the circumstances establish that the evidence originated with the State and was not accessible to appellate counsel. *People v. Smith*, 2021 IL App (1st) 190421, ¶ 59.

¶ 67    In response to our order, the State provided us with the missing ERI. We now consider the potential impact of that evidence on the applicable standard of review. Specifically, we address whether the first part of the *Ornelas* test, which requires that we defer to factual findings by the trial court and reverse the court's ruling only if those findings are against the manifest weight of the evidence, applies in this case. Prior case law would suggest that under these circumstances, our review of the trial court's ruling is subject to a purely *de novo* standard. *People v. Oaks*, 169 Ill. 2d 409, 447-48 (1996); *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453 (2009); *People v. Valle*, 405 Ill. App. 3d 46, 57 (2010); *People v. Quevedo*, 403 Ill. App. 3d 282, 292 (2010).

¶ 68    We begin our discussion with a consideration of the pre-*Ornelas* case of *People v. Oaks*, where our supreme court articulated a manifest weight of the evidence standard of review for claims involving a trial court's ruling on a defendant's motion to suppress statements. *Oaks*, 169 Ill. 2d at 447. Nevertheless, the court determined that *de novo* review was appropriate under the circumstances where "the record contains both a videotape and a transcript of the interrogation so that neither the facts nor the credibility of witnesses is in issue." *Id.* at 447-48.

¶ 69    Likewise, in *Addison Insurance*, our supreme court held that a reviewing court is not bound by the trial court's findings and may review the record *de novo* when the evidence consists of depositions, transcripts, or evidence otherwise documentary in nature. *Addison Insurance*, 232 Ill. 2d at 453.

¶ 70    In *Valle*, considering the enduring impact of *Oaks* after the supreme court's adoption of the *Ornelas* standard, the court noted: "[a]t a less fundamental level several decisions imply that, where the interrogation is on a video recording, the facts are not in dispute and review is necessarily *de novo*." *Valle*, 405 Ill. App. 3d at 57. In reaching its conclusion, the court noted that "[t]he *G.O.*

court did not suggest that the *Oaks* court, under the facts of that case, had erred in using a *de novo* standard overall." *Id.*

¶ 71    In *Quevedo*, the court noted that where the trial court's decision was based on two videotaped recordings that were conducted in Spanish but transcribed in English and stipulated to, the issue presented was a question of law subject to *de novo* review. *Quevedo*, 403 Ill. App. 3d at 292.

¶ 72    The foregoing authority arguably supports applying only *de novo* review in this case where the trial court's ruling was not based on credibility determinations or findings on contested facts. Having said this, we acknowledge that even undisputed facts may potentially result in application of a deferential standard of review where such facts are susceptible to more than a single inference. *McAllister v. Illinois Workers' Compensation Comm'n*, 2020 IL 124848, ¶ 29. However, as will later be discussed in more detail, the trial court's ruling was not based on any inferences but was erroneous as a matter of law.

¶ 73    Nevertheless, our inquiry does not end here, where our supreme court recently considered the applicability of *de novo* review when reviewing the denial of an applicant's request for a Firearm Owner's Identification (FOID) card in *Evans v. Cook County State's Attorney*, 2021 IL 125513.

¶ 74     In *Evans*, after the Illinois State Police (ISP) denied the petitioner's application for an FOID card, the trial court found that petitioner failed to meet his burden of showing that issuing him a FOID card would not be contrary to the public interest. *Id.* ¶ 1. In support of his petition, petitioner provided four character references and his own statement. *Id.* ¶ 11. The matter was set

for a hearing, but the record on appeal contained neither a transcript nor a bystander's report indicating what transpired at the hearing. *Id.* ¶ 12.

¶ 75    The trial court's written order sustained the State's objections to the petition, finding that petitioner had not sustained his burden of establishing that the issuance of a FOID card would not be contrary to the public interest, and found that federal law prohibited petitioner from obtaining an FOID card. *Id.*

¶ 76    The appellate court disagreed with the trial court's finding that the issuance of a FOID card would be contrary to the public interest but affirmed based on its determination that federal law prohibited the petitioner from possessing a firearm. *Id.* ¶¶ 14-16. As is relevant to this case, the appellate court found that the appropriate standard of review for determining whether the petitioner was entitled to relief under the Firearm Owners Identification Card Act (FOID Card Act) (430 ILCS 65/1 *et seq.* (West 2018)) was *de novo* where (1) the trial court only considered documentary evidence, (2) the State neither challenged the legitimacy of the petitioner's evidence nor presented contrary evidence, and (3) nothing in the record suggested that the court held an evidentiary hearing. *Evans*, 2021 IL 125513, ¶ 13.

¶ 77    After this matter was briefed and argued before our supreme court, while retaining jurisdiction, the court remanded the case to the trial court for the limited purpose of setting forth its reasoning in finding that the petitioner failed to sustain his burden to show that the issuance of an FOID card would not be contrary to the public interest. *Id.* ¶ 19. The trial court then entered a written order explaining the basis for its ruling and clarifying that the petitioner's counsel never requested an evidentiary hearing but elected to stand on his submissions. *Id.* ¶¶ 20-23.

¶ 78    In reviewing the appellate court's decision, the supreme court disagreed with the appellate court's determination that federal law precluded the petitioner from restoring his firearm rights. *Id.* ¶ 33. The supreme court then considered the appellate court's application of *de novo* review in determining whether the petitioner established that granting him a FOID card would not be contrary to the public interest. *Id.* ¶¶ 37-42. Distinguishing *Addison*'s "general rule" of *de novo* review when only documentary evidence is received, the court noted the "unique burden of proof" based on the legislative requirement that the petitioner proves his case " 'to the court's *** satisfaction.' " *Id.* ¶ 42. Thus, the circuit court occupied a "superior position" to the reviewing court, requiring the application of an abuse of discretion standard of review. *Id.* ¶¶ 41-42. The court held that the circuit court's thoughtful, detailed response, explaining why the petitioner failed to sustain his burden to establish that granting him a FOID card would not be contrary to the public interest, constituted a proper exercise of the trial court's discretion. *Id.* ¶ 44.

¶ 79    We understand *Evans* to retain the *Addison Insurance* "general rule" of *de novo* review of trial court decisions based on documents, except where the statute at issue explicitly places the decision in the discretion of the trial court. Put differently, when the trial court's ruling is solely based on documentary evidence, review is *de novo* unless circumstances found in *Evans* exist.

¶ 80    Applied to the facts of this case, we believe that the "general rule" of *Addison Insurance* is triggered where the identical documentary evidence before the trial court is now before us, where no live witnesses testified, where the "facts" were undisputed, and where the trial court made no credibility findings. The question of law before the trial court is the same question before us—namely, whether defendant effectively invoked his right to counsel. In contrast to the FOID Card

Act at issue in *Addison Insurance*, the operative statute here 725 ILCS 5/114-11 (West 2010)) does not support the application of an abuse of discretion standard.

¶ 81    We find that the *Ornelas* standard remains the proper standard of review when considering the grant or denial of a motion to suppress and that the *Addison Insurance* "general rule" remains intact when the particular circumstances warrant its application. In this case, where the ERI and transcript were the only evidence considered by the trial court, *Addison Insurance* applies, and we consider, *de novo*, the trial court's denial of defendant's motion to suppress statements based on that same evidence. Even if we were to apply either an abuse of discretion or manifest weight standard, however, our conclusion would not differ for reasons that we will later discuss.

¶ 82            C. Whether Defendant Made an Unequivocal Request for Counsel

¶ 83    Again, we note that the test for determining whether a defendant invoked his right to counsel is objective. *People v. Brickhouse*, 2018 IL App (3d) 150807, ¶ 42; *Schuning*, 399 Ill. App. 3d at 1082. The primary focus remains on the nature of the actual statement. *In re Christopher K.*, 217 Ill. 2d 348, 381 (2005). Where, according to a reasonable officer in the circumstances, an accused's reference to an attorney is ambiguous or equivocal, no cessation of questioning is required. *Davis*, 512 U.S. at 459; *Christopher K.*, 217 Ill. 2d at 378-81.

¶ 84    Here, the trial court determined that defendant's invocation of his right to counsel was ambiguous based on the fact that defendant's invocation took the form of a question and where it then "turned into him asking to speak to his mother." Based on relevant case law, we disagree with the trial court's conclusion.

¶ 85    In *Smith*, 469 U.S. at 92, the defendant was taken to an interrogation room for questioning by two police officers. When the defendant was informed of his right to consult with an attorney

and have him present during questioning, the defendant replied, " 'Uh, yeah, I'd like to do that.' " (Emphasis omitted.) *Id.* at 93. Instead of terminating the questioning, the officer finished reading the *Miranda* rights aloud and then asked the defendant, " 'Do you wish to talk to me at this time without a lawyer being present?' " *Id.* The defendant replied, " 'Yeah and no, uh, I don't know what's what, really,' " and then agreed to answer questions in the absence of counsel. *Id.* The Supreme Court held that the defendant's initial response constituted an unequivocal request for counsel and that, under the bright-line rule stated in *Edwards*, "all questioning must cease after an accused requests counsel." (Emphasis omitted.) *Id.* at 98.

¶ 86    In *Schuning*, 399 Ill. App. 3d at 1075, the parties stipulated that while in intensive care unit (ICU) at the hospital, the defendant " 'asked Officer Giertz of the Addison Police to use the telephone to call his attorney.' " Officer Giertz agreed to allow the defendant to make the phone call; however, a nurse told the defendant that phones could not be used in the ICU. *Id.* Based on the foregoing, the trial court found that the defendant invoked his right to counsel and deemed his subsequent statements to the police inadmissible against him at trial. *Id.* at 1081.

¶ 87    The State appealed the trial court's ruling, claiming that the words used by the defendant did not invoke the right to counsel but were ambiguous where the reason underlying the defendant's wish to call his attorney was unknown. *Id.* at 1081, 1086. The court disagreed, finding that the defendant's request was an unambiguous invocation of his right to counsel where he was in custody, had been interrogated less than three hours earlier, and was told that the police wanted to question him further. *Id.* at 1086. The court noted that the defendant did not inquire whether he should call his lawyer or ponder whether he required counsel but unequivocally asked to call his lawyer, and that request was ignored. *Id.* The appellate court affirmed the trial court's ruling,

finding that the defendant's request to call his attorney, which was not tainted with hesitation or uncertainty, constituted an unambiguous invocation of his right to counsel. *Id.* at 1087.

¶ 88    In *People v. Eichwedel*, 247 Ill. App. 3d 393, 395-96 (1993), the defendant, while in custody, asked if he could call his noncriminal attorney. Rather than discontinuing questioning, the officer asked a follow-up question of whether the defendant knew a criminal attorney, to which the defendant stated that he did not and asked what would happen if he called a criminal attorney. *Id.* The appellate court held that once the defendant asked to call his attorney, all questioning should have ceased because his request was sufficient to invoke his right to counsel. *Id.* at 397-98. As such, the trial court's denial of the defendant's suppression motion was reversed. *Id.* at 399.

¶ 89    Consideration of the foregoing authority leads us to conclude that when, in response to the detective telling defendant, who was the subject of custodial interrogation, "Well, that's what we're trying to figure out, young man," defendant asserted his right to counsel when he replied, "Well, I hope you all get your mother*** test. Can I call my lawyer?" We have viewed the ERI, and there is no ambiguity in defendant's request, which immediately followed intense custodial questioning as to whether defendant shot the victim or knew who shot the victim.

¶ 90    The trial court's apparent belief that the assertion was ambiguous because it was conveyed in the form of a question was erroneous as a matter of law. The requests made in *Schuning* and *Eichwedel* are analytically indistinguishable from defendant's request in this case. While a "clarifying question[ ]" is certainly appropriate when a suspect makes an ambiguous or equivocal statement (see *Davis*, 512 U.S. at 461), here, defendant's request to call his attorney was neither.

¶ 91    In the face of a straightforward question invoking defendant's right to counsel, the follow-up question was inappropriate. The court erroneously believed that it was supposed to "look at all

factors here by all of the questions that occurred together," where such additional questions and responses should not have been a basis for undermining an otherwise unambiguous assertion of the right to counsel. The law disallows an accused's postrequest responses to further interrogation to cast retrospective doubt on the clarity of the initial request. *Smith*, 469 U.S. at 100. Defendant invoked his right to counsel while in custody, and his request was not scrupulously honored. His statement should have been suppressed.

¶ 92    Even if we consider defendant's immediate response to the detectives' follow-up question of "[o]r call my momma *and then call my lawyer*. And you can talk to her" (emphasis added), we believe that a reasonable officer would have understood that defendant was invoking his right to counsel. See *Christopher K.*, 217 Ill. 2d at 381. Application of a deferential standard of review would not change our opinion; defendant's request to call his mother *and* then call his lawyer did not diminish defendant's previous assertion of his right to counsel.

¶ 93                    D. Whether Defendant Reinitiated Contact With the Police

¶ 94    Next, we consider the State's claim that even if defendant invoked his right to counsel, the substance of the ERI was nevertheless admissible because defendant reinitiated conversation with the police based upon the following exchange:

> "[THE DETECTIVE]: If you want to talk, we can talk. If you don't want to talk to us you don't have to talk to us.
>
> DEFENDANT: D***, I just told you all, man, what I knew, man, for real, man. I don't know who the f*** shot the dude, man. I don't know—like I said, man, none of my clique is even parked by me, you know what I'm saying, everybody ***."

¶ 95   We disagree with the State's claim that defendant reinitiated contact with the police. When a defendant reinitiates contact after an invocation of the right to counsel, the burden remains on the prosecution to show that subsequent events indicated a waiver of the right to have counsel present. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983) (opinion of Rehnquist, J., joined by Burger, C.J., and White and O'Connor, JJ.). Reinitiation only occurs when the accused, not the police, reopens dialogue with the authorities. *Edwards*, 451 U.S. at 486 n.9.

¶ 96   The determination of whether an accused initiated further discussion with the police involves the application of a two-part inquiry. *Woolley*, 178 Ill. 2d at 198 (citing *Bradshaw*, 462 U.S. at 1044-45 (opinion of Rehnquist, J., joined by Burger, C.J., and White and O'Connor, JJ.)). First, after invoking the right to counsel, the accused must initiate further discussion. *Id.* The defendant must make a statement that evinces a " 'willingness and a desire for a generalized discussion about the investigation.' " *Id.* If the defendant did not initiate the conversation, his subsequent statements are inadmissible. *Id.* at 199. If, however, the defendant did initiate the conversation, the court considers whether the defendant's waiver of the right to counsel was knowing and intelligent. *Id.*

¶ 97   The State relies on *Woolley* to support its claim that defendant reinitiated contact with the police; however, the facts of *Woolley* are highly distinguishable from those presented in the case at bar. In *Woolley*, after being told that his wife implicated him in an offense, the defendant said that he wanted an attorney. Seconds later, he said, " 'Yeah. I killed them.' " *Id.* at 195. The detective followed up by telling the defendant that " 'this is the only opportunity you will get to talk to us,' " and that to talk to the police, the defendant had to " 'recant' " his request for an

attorney. *Id.* At this point, the defendant indicated that he wished to talk to the officers without an attorney present and implicated himself as the shooter. *Id.*

¶ 98    The court noted that the defendant's act of making another statement immediately following his request for an attorney could clearly be considered initiation of a further conversation with the police. *Id.* at 200-01. Additionally, the court found that the two interrogating officers properly understood that the defendant's latter statement indicated his willingness to continue the discussion of the investigation. *Id.* at 202. Finally, where the defendant did not challenge the trial court's determination that the defendant's waiver was knowing and intelligent, the supreme court affirmed the trial court's ruling denying the defendant's motion to suppress his confession. *Id.* at 202-03.

¶ 99    *Woolley* stands in stark contrast to this case. In this case, after defendant requested to call his lawyer after he made an alternative request to call his mother and his lawyer, and after he announced, "So I'm ready to make a phone call sir," the following transpired:

> "[THE DETECTIVE]: So you don't want to talk to us anymore?
>
> DEFENDANT: I'll, I'll sit here and talk to you all with, with
>
> [THE DETECTIVE]: No, we don't want to sit here and chit chat. I mean if you want to talk to us, we gonna talk about—
>
> [THE DETECTIVE]: If you want to talk, we can talk. If you don't want to talk to us you don't have to talk to us.
>
> DEFENDANT: D***, I just told you all, man, what I knew, man, for real, man. I don't know who the f*** shot the dude, man. I don't know—like I said,

man, none of my clique is even parked by me, you know what I'm saying,

everybody ***"

¶ 100   Defendant did not initiate further conversation with the detectives but responded to the detectives' question, asking whether he no longer wished to speak with them. To the extent that the detectives were questioning whether defendant was asserting his right to remain silent, and defendant responded to that question by stating that he previously told the police what he knew, defendant did not initiate further discussions with the detectives or "undo" his previous assertion of his right to counsel. Nevertheless, questioning persisted. Following his repeated denials of guilt, 29 hours after invoking his right to counsel, defendant confessed to committing this crime.

¶ 101                E. Whether the Error Was Harmless Beyond a Reasonable Doubt

¶ 102   The State finally maintains that even if the trial court's ruling was in error, the error was harmless beyond a reasonable doubt. Again, we cannot agree.

¶ 103   Confessions obtained in violation of the sixth amendment right to counsel are involuntary. *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)); see *Harris*, 2012 IL App 100678, ¶ 75. The admission of such a statement is subject to the heightened standard of being proven to be harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 23-24 (1967); *People v. Fort*, 2014 IL App (1st) 120037, ¶ 19. An error is considered harmless where the reviewing court can conclude that absent the error, the outcome of the trial would not have differed. *Neder v. United States*, 527 U.S. 1, 18 (1999).

¶ 104   "In determining whether a constitutional error is harmless, the test to be applied is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained." *People v. Patterson*, 217 Ill. 2d 407, 428 (2005). Our supreme court has suggested three

different approaches for determining whether a constitutional error is harmless: "(1) focusing on the error to determine whether it might have contributed to the conviction, (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction, and (3) determining whether the improperly admitted evidence is merely cumulative." *Id.* Our supreme court has also noted that because "[c]onfessions carry extreme probative weight, *** the admission of an unlawfully obtained confession rarely is harmless." (Internal quotation marks omitted.) *People v. St. Pierre*, 122 Ill. 2d 95, 114 (1988).

¶ 105   Here, there is no question that the evidence of defendant's guilt was substantial. We cannot, however, find that the error introducing defendant's confession was harmless beyond a reasonable doubt where it contained incriminating evidence not directly established by any other means. In his videotaped confession, defendant admitted passing the gun to the man in the red shirt, named this individual as "Mike," said that Mike was his friend, and stated that Mike fired four or five rounds at a Buick leaving the scene. While the original charges in which Dayonne was the named victim were nol-prossed, this fact did not diminish the prejudicial impact of defendant's confession, particularly where the State relied on it in opening statement and rebuttal closing argument.

¶ 106   In opening statement, the State told the jury:

> "THE STATE: You're going to hear at that point as he's trying to get away, another individual with a red striped shirt comes up who Tyrece had been talking to, a guy named Michael Brock. Tyrece gives him the gun. Tyrece gets in the car and tells Kristin to go. As they're leaving, Michael Brock is shooting at the car as it tries to get away. One bullet goes through the back windshield and hits Taiwan

[*sic*] right in the head. The other bullet as he's getting in hits him on the side. He's able to move his car up to a fish stand next door and stop where he falls out of the car and gets help.

* * *

And he's going to tell you then how he gave the gun to Michael Brock and as they left Michael Brock, he heard shots. He doesn't know if Michael Brock hit him, but they were fleeing and Michael Brock was shooting at the other man who got away because that man could identify him. He knew that if he got away he could identify Tyrece."

¶ 107    The State's rebuttal closing argument explicitly argued that:

"THE STATE: [Defendant] tried to keep Dayonne from coming in here by giving the gun to a buddy and having him shot. He shot him—he got shot in the head, and he got shot here. But he lived. And he came to court and testified.

* * *

Mr. Perry survived being shot in the head, in the side, and came forward. That's not what he intended. He intended one to be dead and the other one, the girl, not to come."

¶ 108    To be clear, we are not suggesting any impropriety in the State's argument, which was properly based on evidence adduced at trial and logical inferences that flowed therefrom. The problem arises from the fact that the erroneous introduction of defendant's statement proved what no other evidence admitted at trial proved—namely, that defendant transferred the gun to the man wearing the red shirt, that this person's name was "Mike," that Mike was defendant's friend,

and that Mike shot Dayonne. The introduction of this evidence was extremely prejudicial, where it provided a factual basis for the State to argue that defendant was responsible for the injuries suffered by Dayonne and instructed Mike to shoot Dayonne to prevent him from testifying against defendant at trial. We also cannot ignore the fact that the jury asked to review this videotaped confession during its deliberations and asked whether "Mike" was charged with anything.

¶ 109 We are left to conclude that, despite the extensive evidence supporting this verdict, the State cannot show that the admission of defendant's confession was harmless beyond a reasonable doubt.

¶ 110 III. CONCLUSION

¶ 111 For the foregoing reasons, we reverse defendant's conviction and remand for a new trial.

¶ 112 Reversed and remanded.

**No. 1-17-2416**

| | |
|---|---|
| **Cite as:** | *People v. Coleman*, 2021 IL App (1st) 172416 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 13-CR-21040; the Hon. Carl B. Boyd, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Andrew Thomas Moore, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and Stacia Weber, Assistant State's Attorneys, of counsel), for the People. |